93 A.3d 829

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Albert PEREZ, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 15, 2011.

Decided June 16, 2014.

conclude appellee had evidence to offer; to conclude otherwise would be speculation").

Eric E. Winter, Esq., Missan Law Offices, Bechtelsville, William Charles Bispels Jr., Esq., Reading, for Albert Perez.

John T. Adams, Esq., Alisa Rebecca Hobart, Esq., Berks County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice EAKIN.

This is a direct appeal from two death sentences imposed by a jury upon Albert Perez following his convictions of first degree murder and abuse of corpse. We affirm.

On the morning of January 15, 2007, Liz Ruiz received an email which purportedly came from her sister, Duceliz Diaz–Santiago, with whom appellant had previously been romantically involved. The email stated Diaz–Santiago was "doing something today thast [sic] will affe4ct [sic] us all," Trial Court Opinion, 1/31/11, at 5 (citation omitted), then claimed appellant's ex-wife's boyfriend had raped Diaz–Santiago while the ex-wife watched. The email asked Ruiz to kill appellant's ex-wife and her boyfriend, but leave appellant alone because it was not his fault, and professed love for appellant. The message concluded by stating, "[I'm] sorry it has to be this way everyone, but this is what iv[sic] wanted to do for a very long time [sic][.]" *Id.* (citation omitted).

Concerned by the message, Ruiz went to the apartment where Diaz–Santiago lived with her five-year-old daughter, Kayla. When Ruiz arrived, her mother was already there, but the two women could not get into the locked apartment. Ruiz's husband arrived and kicked the door down. When he entered the apartment, he saw Kayla's body hanging from a railing in the bathroom. The police were summoned and checked the rest of the apartment, finding Diaz–Santiago's body lying face up in a closet doorway. A pair of pajama

bottoms was tied around the neck of Kayla's body, and the towel rack from which her body was suspended took little effort to remove from the wall, indicating the body was in a resting state when it was hung there. Part of a power cord was wrapped around the neck of Diaz–Santiago's body, not tied or fastened, and a second portion of cord was found on the closet's clothes bar. The clothing on Diaz–Santiago's body was not bunched up but was perfectly flat.

These details caused police to suspect the deaths were not the murder-suicide scenario the posing of the bodies imitated. Police collected forensic evidence, including seminal fluid from Diaz–Santiago's clothing, bedding, and body cavities, a swabbing of a wound on her left arm, and fibers found in Kayla's hair and pajama bottoms. The fibers fluoresced pink when viewed under an alternate light source.

Two days later, appellant waived his rights and gave police his first statement. He indicated he had been romantically involved with Diaz–Santiago, but the relationship ended a year before. Appellant stated that when he lived with Diaz–Santiago, Kayla had known him as "daddy," and he had completed paperwork to obtain custody of her. He stated he had not spoken with either victim in the past two months. Appellant claimed he drove his current girlfriend to work in her blue Honda on the morning of the murders, then returned home and went to bed. The girlfriend's family, with whom appellant lived, provided him with an alibi, stating he was at home during the relevant time period.

The ongoing police investigation revealed the cause of Diaz–Santiago's death was asphyxiation due to ligature strangulation, and the manner of death was homicide; police reconstruction revealed it would have been impossible for the body to have landed the way it was found, had the manner of death been suicide. Likewise, the cause of Kayla's death was ligature strangulation, and the manner of death was homicide; the police investigation determined the pajama leg that cut off her air supply could not have become tight enough to strangle her simply from the weight of her body.

Later in January, appellant gave police a second statement after waiving his rights. He denied seeing Diaz–Santiago on the day of the murder, which was a Monday, but said he saw her outside of her workplace the previous Friday. He said he had been waiting for her in his car, and she wanted to have sex with him, so they had unprotected sex in the front seat. When confronted about a blue car seen headed towards Diaz–Santiago's apartment the morning of the murder, appellant said he was not in that part of town that day, but he supposed the car could have been stolen, and continued to deny his involvement. He admitted he shared an email account and an America Online handle with Diaz–Santiago, but said she changed the password when they broke up and he had not used the account since. He also stated he believed she had "d[one] this because of him." N.T. Trial, 5/12–15/09, at 129.

Police obtained a search warrant for the blue Honda, as well as video footage from a carwash near the victims' apartment showing a similar vehicle traveling towards the apartment the morning of the murders and away from it about three hours later; the occupant of the vehicle and its license plate could not be ascertained. A pair of black driving gloves was recovered from the car, as well as fibers from the rear floor mat which fluoresced pink or orange, similarly to those found on Kayla's body. Pursuant to a warrant, police searched the residence where appellant lived and found a Walmart bag containing video games in the closet of his bedroom. A Playstation video game console was also recovered, which bore the same serial number as an empty Playstation box found in the victims' apartment. Diaz–Santiago's family gave police a photograph showing a Playstation console underneath her television in the bedroom; the same space in the bedroom was unoccupied following her death.

Appellant gave police a third statement in January, after again waiving his rights. This time, he admitted he was at the victims' apartment the morning of the murders, after he took his girlfriend to work. He claimed Diaz–Santiago met him at the door in lingerie and he asked her to change, telling her their relationship was over and he no longer wanted to pay

child support for Kayla. Appellant stated Diaz–Santiago gave him his things, putting his Playstation console in a plastic bag, and he went home and went back to bed. He denied having sex with Diaz–Santiago or having any contact with Kayla. When asked if something happened at the apartment that would lead him to kill Diaz–Santiago, appellant replied no.

Three months later, appellant waived his rights again and gave police a fourth statement, now claiming Diaz–Santiago answered the door in lingerie, grabbed his hand, and took him to the bedroom, where they had sex. He said she showed him some photos on her computer, and he touched the mouse to scroll through them. When his girlfriend called him twice, he took the second call in the bathroom and told her he was at home watching television, and then told Diaz–Santiago he had to leave. She gave him his Playstation console and told him she would see about removing him from child support. According to appellant, he said goodbye to both victims and left before noon. He claimed it had been Diaz–Santiago's idea for them to meet that morning.

However, police discovered an instant-message conversation between Diaz–Santiago and a co-worker from the Friday before the murders, in which Diaz–Santiago said it was appellant's suggestion they meet; he had been waiting outside her workplace that day and tried to persuade her to take Monday off so he could spend the day with her and Kayla; he wanted to talk to her about resuming their relationship. Diaz–Santiago expressed ambivalence to appellant, her co-worker, and an additional friend about whether this was a good idea. The friend thought it was odd that appellant wanted Kayla to be present because he rarely asked about her when he called Diaz–Santiago. Diaz–Santiago told her friend and her sister that she planned to be home with Kayla on Monday when appellant came over.

A week later, appellant gave a fifth statement to police after waiving his rights. This version was consistent with his second statement—he met Diaz–Santiago at her workplace the Friday before the murders—except he denied having sex with her in the car, and further claimed it was Diaz–Santiago's idea

that they meet on Monday to discuss child support. He reiterated his admission in his fourth statement that he went to the victims' apartment in the blue Honda. He maintained Diaz–Santiago initiated unprotected sex after she answered the door in lingerie; she requested they resume their relationship, but he declined. He stated while he was on the phone with his girlfriend in the bathroom, Kayla woke up and Diaz–Santiago fed her, then Diaz–Santiago gave him his belongings, which included the Playstation console, told him not to come back, and that she would take care of the child support issue; he then left.

Though appellant specifically denied killing the victims, police asked if this was something he had planned all weekend; he said no. When police suggested something must have happened during the visit that caused this, appellant initially did not respond, but then agreed something happened. The questioning officer asked, "[S]o[,] what you're telling me is something happened in that apartment that caused you to snap and that's what caused you to kill her[?]" *Id.*, at 398. Appellant nodded affirmatively, and moments later said Diaz–Santiago became angry when he refused to stay. His next few exchanges with the officer were focused on his concern that if he said anything more, he would not be going home, and he said he needed to talk to his girlfriend before saying anything more. When the officer confronted appellant with his belief that appellant killed Diaz–Santiago and whoever killed her also killed Kayla, appellant denied killing Kayla and then refused to say more until he spoke to his girlfriend.

One week later, appellant was arrested for the murders and gave a sixth statement to police, first orally and then in writing. He claimed that moments after he left Diaz–Santiago's apartment, she yelled out the window for him to come back. He said when he did, he saw Kayla lying dead on the bed. He and Diaz–Santiago began arguing; appellant claimed Diaz–Santiago said if she could not have him, no one else could. He said he grabbed a cord and wrapped it around her neck; after about a minute, she went limp and fell to the floor. Appellant said he went outside to smoke and call his girl-

friend, and he put on black, baseball-type gloves before going back inside. He wrapped a pajama leg around the neck of Kayla's body and hung it from the bathroom rack, then tried to make it look like Diaz–Santiago had hung herself in the closet, but the closet bar snapped and the body fell to the floor, where he left it.

At trial, the Commonwealth presented the testimony of numerous experts and laypersons to establish the events leading up to the murders, to explain how the murders occurred, to show appellant's motive, and to disprove appellant's claim that Diaz–Santiago killed Kayla. Among the witnesses presented was an inmate who met appellant while they were both in county prison. The inmate testified appellant asked him, "[W]hat's going to happen to me when I go to prison and they find out I killed the little girl, too[?]" *Id.*, at 448. He further stated when he spoke to appellant about pleading guilty, appellant said he was probably going to get five to ten years in prison for killing the child's mother. *Id.*

Appellant's ex-wife testified she and appellant had four children, over whom they constantly battled about support. She denied ever watching her boyfriend rape Diaz–Santiago, contradicting the email purportedly sent by Diaz–Santiago to Ruiz. Her boyfriend also testified he did not rape Diaz–Santiago and had never even met her.

The county domestic relations office confirmed the support dispute between appellant and his ex-wife, and noted the records showed appellant acknowledged paternity of both Kayla and his fourth child with his ex-wife around the same time. After a final support order was entered for his children with his ex-wife, appellant sought and obtained modification of support for all of his children. He then sought additional modification of his support for Kayla, recanting his acknowledgement of paternity for her; his support obligation for her was terminated following her death.

A forensic linguistics expert who compared the purported "suicide email" with known writings of appellant and Diaz–Santiago testified there were similarities between the email

and appellant's writings. The expert concluded the email was a "Post Offensive Manipulation of Investigation Communication[,]" *id.*, at 320, made during or after the crime with the intent that it end up in the hands of the media or criminal justice system, for the purpose of suggesting a suspect and manipulating the investigation.

A psychiatric expert testified nothing in his review of the evidence pointed to Diaz–Santiago being inclined to murder her daughter. The expert further testified appellant's claim— that Diaz–Santiago told him if she could not have him, no one else could—did not make sense from a psychiatric perspective, as "[t]ypically that sort of statement is made in the context of an aggressive act toward the person who is leaving ... [a]nd ... it's much more common ... to be heard ... coming from a guy toward a woman." *Id.*, at 334.

Diaz–Santiago's family and friends testified she was a good mother and would never hurt Kayla, who "was her life[.]" N.T. Trial, 5/6/09, at 77–78. The physician who performed the autopsies also reviewed Kayla's medical records and testified he saw no evidence of abuse or neglect of Kayla by Diaz–Santiago.

A member of the state police forensic services unit who was present at both victims' autopsies testified concerning the items collected from their bodies. Specifically, this witness noted fibers recovered from the gloves found in the blue Honda, as well as from the floor mat of the car, had the same reaction to ultraviolet light as the fibers found on Kayla's body. A dragon figurine found in the trunk of appellant's car also contained a fiber which fluoresced under the same wavelength of light as those found on Kayla's body.

A trace evidence expert from the state police crime lab, who analyzed the two pieces of electrical cord found at the crime scene, testified the pieces matched and were previously one piece. This expert also confirmed the fibers found in Kayla's hair and on her pajama bottoms matched the microscopic characteristics of those found in the trunk of appellant's car,

though he was unable to conclusively determine whether they shared a common origin.

An expert serologist from the state police crime lab testified she identified seminal fluid in Diaz–Santiago's body cavities, as well as on her bedding and underwear; the semen collected from the body indicated sexual contact occurred within 24 to 25 hours prior to collection. A state police expert testified the DNA from appellant's blood matched that of the semen collected from Diaz–Santiago's body and underwear. His analysis of the DNA profile taken from a swab of a wound on the body's forearm revealed it was consistent with a "mixture[,]" N.T. Trial, 5/12–15/09, at 275, of which appellant and Diaz–Santiago could not be excluded as potential contributors. The DNA profile obtained from a swab of the outside of the gloves recovered from the blue Honda was also consistent with a mixture, but the DNA profile from the swab's major component matched Diaz–Santiago's DNA. A swab from the inside of the gloves revealed a DNA mixture, of which appellant and Diaz–Santiago could not be excluded as potential contributors. The DNA collected from the portion of the cord tied to the closet bar could not be interpreted because there was an insufficient amount of it present; this was consistent with the person who handled the cord having worn gloves.

An expert in forensic pathology, who reviewed the autopsy records and appellant's police statements, testified appellant's version of how he briefly strangled Diaz–Santiago until she merely passed out, later dying, was not medically possible; one minute of pressure around the neck would have been insufficient to kill her, as the ligature must be held long enough to cause brain stem damage for death to occur. According to the autopsy report, Kayla's stomach was empty, contrary to appellant's statement that Diaz–Santiago fed her before he left. The expert also refuted appellant's claim that Diaz–Santiago killed Kayla while appellant was outside, stating it would not have been possible during that brief time.

The jury found appellant guilty of two counts each of first degree murder and abuse of a corpse. At the penalty phase, the Commonwealth presented evidence in support of one

aggravating circumstance regarding Diaz–Santiago's murder: appellant was convicted of another murder committed before or at the time of the instant offense. 42 Pa.C.S. § 9711(d)(11). Regarding Kayla's murder, the Commonwealth presented evidence in support of the same aggravating circumstance, as well as the aggravating circumstance in § 9711(d)(16). *Id.*, § 9711(d)(16) (victim was child under 12 years of age). Appellant presented evidence in support of two mitigating circumstances regarding each of the murders: his age (25 years old) at the time of the offense, *id.*, § 9711(e)(4), and the "catch-all" mitigating circumstance, *id.*, § 9711(e)(8) (any other evidence of mitigation concerning defendant's character, record, and circumstances of offense), namely, his abusive and violent upbringing. The jury found all of the aggravating circumstances and the catch-all mitigating circumstance were established with respect to each murder. Weighing the aggravating circumstances against the mitigating circumstance in each case, the jury concluded the aggravators outweighed the mitigator, and imposed a death sentence for each murder.

Appellant received new counsel and filed a timely post-sentence motion alleging errors in the guilt and penalty phases, as well as the ineffectiveness of his lead trial counsel. Because lead counsel had died prior to the motion's filing, the trial court decided to hold an evidentiary hearing on all of the issues, including the ineffectiveness claims, relying on *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853 (2003).[1] See Trial Court Opinion, 1/31/11, at 4 (citation omitted). Following the hearing, the trial court denied relief.

■ This appeal followed. Appellant raises twenty-five lettered issues, nearly exhausting the alphabet, and causing us to reiterate that volume does not equal quality. Appellant's brief is replete with beyond-boilerplate allegations containing sparse argument and even less citation to supporting authority

---

1. *Bomar* permitted ineffectiveness claims to be addressed on direct review—as opposed to on collateral review, as required by *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002)—if the trial court held an evidentiary hearing on the claims and disposed of them in an opinion. *See Bomar*, at 853–55 (citations omitted).

or identification of pertinent portions of the record. His attempt to incorporate the entire trial transcript into his brief is insufficient, *see Commonwealth v. Briggs,* 608 Pa. 430, 12 A.3d 291, 342–43 (2011) (citations omitted) (rejecting appellant's attempt to incorporate by reference brief authored by different counsel on post-sentence motion),[2] as are his bald assertions containing no developed argument. In his summary of argument, appellate counsel attempts to explain such cursory advocacy:

It has become standard in cases such as this to raise challenges to the death penalty and the sentencing scheme for the death penalty, although [a]ppellant does not have any new arguments with respect to those issues.

\* \* \*

Counsel has presented several issues for which the law currently does not present an avenue for relief for [a]ppellant. This is done to potentially prevent later arguments of waiver should the law in any of these areas change. Hopefully this Court will respect this [c]ounsels' [sic] position, as this [c]ounsel believes that such an approach is required for thorough and effective advocacy.

Appellant's Brief, at 15, 17.

▮ The Rules of Appellate Procedure set forth the fundamental requirements every appellate brief must meet. As we noted in *Briggs:*

The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review ... may be properly exercised. Thus, we reiterate that compliance with these rules by appellate advocates ... is mandatory.

---

**2.** Not only would incorporation of the entire trial transcript exceed the 70–page limit in effect at the time the brief was filed, Pa.R.A.P. 2135(a)(1), it defeats the very purpose of a brief, a term that is not a misnomer.

*Briggs*, at 343. Accordingly, to the extent appellant's claims fail to contain developed argument or citation to supporting authorities and the record, they are waived, as further discussed *infra* regarding each specific issue. Those issues are:

A. Whether the evidence in the instant case was insufficient to support the verdicts and the verdicts should be overturned[.] The evidence against [appellant] in relation to the death of Kayla Diaz was wholly circumstantial and did not constitute proof beyond a reasonable doubt.

B. Whether the verdicts in this case were against the weight of the evidence and should therefore be overturned[.]

C. Whether the evidence in this case was insufficient to support the jury's finding of aggravating factors supporting the death penalty[.]

D. Whether the jury's finding of aggravating factors in this case were [sic] against the weight of the evidence[.]

E. Whether the [j]ury's finding that the aggravating factors outweighed the mitigating factors was against the weight of the evidence[.]

F. Whether the death penalty as imposed in this case was the product of passion, prejudice and/or other arbitrary factors[.] See 42 Pa.C.S.A[.] § 9711(h)(3). The passion and/or prejudice occurred due the [sic] inadmissible evidence that was considered by the jury as detailed herein.

G. Whether the [d]eath [p]enalty is unconstitutional as cruel and unusual punishment under the United States and Pennsylvania Constitutions[.]

H. Whether the [d]eath [p]enalty sentencing scheme as provided for in Pennsylvania law is unconstitutional under the United States and Pennsylvania Constitutions[.]

I. Whether [t]rial [c]ounsel was ineffective in not objecting to the testimony of Trooper Wesner[.] Trooper Wesner was not qualified as an expert. Yet Trooper Wesner was permitted to testify without objection to the fact that the fibers in the trunk of [appellant]'s car and on Kayla's neck fluoresced similarly (N.T. 5/12/09, p. 150). Whether fibers fluoresce similarly in [sic] an opinion beyond that of a lay

person and the Corporal should not have been permitted to testify without being qualified as an expert. Moreover to the knowledge of this counsel, using a fluorescent light to compare fibers has never been raised or accepted previously by a [c]ourt of this Commonwealth. Therefore [t]rial [c]ounsel should have raised a Frye challenge to the comparison of fibers under fluorescent light.

J. Whether, similarly to issue I [sic], [t]rial [c]ounsel failed to raise a *Frye* challenge or objection to the testimony of Clyde Liddick, in particular Mr. Liddick's testimony as to the fibers. There was no showing that the testimony that he offered in respect to fibers was scientifically accepted or, in the alternative, was accurate enough to warrant expert testimony. Unlike DNA or fingerprint comparison, (for example), Mr. Liddick was completely unable to define the parameters of a fiber match.

K. Whether [t]rial [c]ounsel was ineffective in failing to raise a *Frye* challenge to the testimony of James Fitzgerald[.] Linguistic analysis has never been raised or accepted by any [c]ourt of this Commonwealth previously.

L. Whether [t]rial [c]ounsel was ineffective for failing to object to the testimony of Dr. John O'Brien[.] Dr. O'Brien testified as a mental health expert that Duceliz Diaz did not kill Kayla.

M. Whether [t]rial [c]ounsel was ineffective for failing to call character witnesses. [Appellant] identified several of his former coworkers as potential character witnesses as well as his other sister-in laws [sic]. Trial counsel failed to investigate or present those witnesses. [Appellant] believes that these witnesses could have testified as to his character for being non-violent.

N. Whether [t]rial [c]ounsel was ineffective for failing to object to the testimony of Liz Ruiz and Hector Ruiz insofar as they testified to the fact that Duceliz Diaz would not have killed Kayla[.] Such testimony was beyond lay opinion and inadmissible as it lacked expert foundation and served to improperly bolster the Commonwealth's case.

618

O. Whether [t]rial [c]ounsel was ineffective for failing to object to or making a motion to exclude the e-mails testified to by Glenys Cosme? Said e-mails contained a number of hearsay statements from Duceliz Diaz. These statements are being offered for the truth of the matter asserted and do not constitute any type of hearsay exception.

P. Whether [t]rial [c]ounsel was ineffective for failing to object to the testimony of Johanna Romero[.] Ms. Romero's testimony was constantly interspersed with hearsay information that she had obtained from Duceliz Diaz, or statements that have absolutely no foundation.

Q. Whether [t]rial [c]ounsel was ineffective for failing to object to the testimony of Miosotis Diaz[.] Ms. Diaz'[s] testimony was constantly interspersed with hearsay information that she had obtained from Duceliz Diaz, or statements that have absolutely no foundation.

R. Whether [t]rial [c]ounsel was ineffective for failing to fully examine Donald Sumner as to his prior criminal history[.] Trial counsel did not present evidence as to all of Mr. Sumner's convictions or make it clear to the jury the fact that these all occurred a relatively short time before Mr. Sumner testified.

S. Whether [t]rial [c]ounsel was ineffective for failing to object to the testimony of Miosotis Diaz insofar as it referred to [appellant]'s knowledge of how to commit a murder and make it look like a suicide[.] The conversation between [appellant] and Miosotis occurred at least two years prior to the alleged murders and dealt with Jajaira Perez. The conversation was therefore irrelevant. While the [c]ourt gave a limiting instruction and attempted to curtail the witness'[s] testimony, the testimony actually presented it [sic] at trial was so vague and confusing that a juror could easily have inferred that [appellant] was talking with Miosotis about killing Duceliz. Trial [c]ounsel should have asked for a mistrial or further instructions as the jury was left with the impression that [appellant] had premeditated plans to kill Duceliz.

T. Whether [t]rial [c]ounsel was ineffective in failing to secure a pathologist for the [d]efense to counter the opin-

ions of Dr. Isadore Mihalakis, where a pathologist was available who would testify contrary to Dr. Mihalakis[.]

U. Whether [t]rial [c]ounsel was ineffective in challenging the racial makeup of the jury array. [Appellant] is Hispanic. The jury array vastly underrepresented the Hispanic population of Berks County. Alternatively, the jury array provided to [appellant] was unconstitutional as it failed to present a fair racial representation of the community. *See Commonwealth v. Johnson* [572 Pa. 283], 815 A.2d 563 (Pa.2002).

V. Whether [t]rial [c]ounsel was ineffective in failing to object to the admission and publication to the jury of Commonwealth's exhibit 6–a. This color photo showing Kayla Diaz was inflammatory and should not have been permitted under *Commonwealth v. Rogers* [485 Pa. 132], 401 A.2d 329 (Pa.1979).

W. Whether [t]rial [c]ounsel was ineffective in failing to object to the admission and publication to the jury of Commonwealth's exhibit 5. This color photo showing Duceliz Diaz was inflammatory and should not have been permitted under *Commonwealth v. Rogers* [485 Pa. 132], 401 A.2d 329 (Pa.1979).

X. Whether [t]rial [c]ounsel was ineffective in failing to object to the admission and publication to the jury of Commonwealth's exhibit 11–a. This color photo showing Duceliz Diaz was inflammatory and should not have been permitted under *Commonwealth v. Rogers* [485 Pa. 132], 401 A.2d 329 (Pa.1979).

Y. [Whether t]rial [c]ounsel was ineffective in failing to rehabilitate jurors who were adverse to the death penalty and in multiple cases agreeing to those jurors being struck. In particular jurors 39 (p. 311), 50, (p. 349), 84 (p. 516), 85 (p. 519), 99 (p. 562), and 24 (p. 760).

Appellant's Brief, at 5–11.

A.–B. *Sufficiency and Weight of the Evidence in Support of First Degree Murder Conviction*

■ Appellant's challenge to the sufficiency of the evidence consists of a brief statement in which he "generally challenges

the sufficiency of the evidence[,] . . . hereby incorporat[ing] the trial transcripts for the purposes of this argument." *Id.,* at 19. He then sets forth his specific claim: the evidence in support of his murder conviction was circumstantial and legally insufficient. Appellant claims his version of the events as presented in his last police statement provides an explanation for the two deaths, and compared with his statement, the Commonwealth's evidence did not establish beyond a reasonable doubt that he killed Kayla or that his killing of Diaz–Santiago was first degree murder. Appellant's alternative claim is a one-sentence, general allegation stating his belief the verdicts were against the weight of the evidence.

With respect to appellant's sufficiency claim, his challenge actually sounds in weight of the evidence, as he contends his explanation of the events in his final police statement negated the Commonwealth's theory of the case; this contention amounts to an assertion that his version of events should have been credited over the Commonwealth's. *See Commonwealth v. Johnson,* 615 Pa. 354, 42 A.3d 1017, 1026 (2012) (citation omitted) (noting appellant's contention that his explanation concerning his alleged attempts to revive victim should have been credited went to weight, not sufficiency, of evidence). Thus, appellant's claim is not truly a sufficiency challenge.

In all cases where a death sentence has been imposed, "this Court is required to conduct an independent review of the sufficiency of the evidence supporting a first-degree murder conviction." *Commonwealth v. Chamberlain,* 612 Pa. 107, 30 A.3d 381, 393 (2011) (citations omitted). Thus, despite appellant's failure to articulate an adequate sufficiency claim, we are mandated " 'to review the record to ensure the evidence sufficiently supports the first degree murder conviction and the finding of aggravating circumstances, and that the sentence was not the product of passion, prejudice, or other arbitrary factors.' " *Johnson,* at 1025 (quoting *Commonwealth v. Dick,* 602 Pa. 180, 978 A.2d 956, 958 (2009)). Accordingly, we will discharge our obligation.

When reviewing the sufficiency of the evidence for first degree murder, we are obliged to determine whether the

evidence presented at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to satisfy all elements of the offense beyond a reasonable doubt.

*Commonwealth v. Spell*, 611 Pa. 584, 28 A.3d 1274, 1278 (2011) (citation and internal quotation marks omitted). To convict a defendant of first degree murder, the Commonwealth must establish a human being was unlawfully killed, the defendant was responsible for the killing, and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. § 2502(a); *Johnson*, at 1025 (citation omitted). The Commonwealth may use wholly circumstantial evidence to discharge its burden of showing the accused intentionally killed the victim, *see Briggs*, at 306 (citations omitted), and circumstantial evidence can itself be sufficient to prove any or every element of the crime, *see Chamberlain*, at 394 (citations omitted).

■ We find the Commonwealth provided sufficient evidence to prove each element of first degree murder beyond a reasonable doubt. The evidence demonstrated both victims were killed by strangulation, and the manner of death for both was homicide. During his fifth statement to police, appellant admitted to killing Diaz–Santiago when he affirmatively nodded his head in response to the officer's query; in his sixth statement, he admitted to wrapping the cord around Diaz–Santiago's neck and briefly strangling her until she went limp. Appellant also expressed concern to his fellow inmate about the consequences he would face for killing Kayla as well as her mother.

The circumstantial evidence also pointed to appellant. Forensic evidence placed him in the apartment the morning of the murders and negated his version of events. Expert testimony established the email purportedly written by Diaz–Santiago was a "Post Offensive Manipulation of Investigation Communication," which bore similarities to known writings by appellant. A forensic pathologist testified it would have been impossible for appellant to have strangled Diaz–Santiago for only a minute, as he claimed; to cause death, the ligature would had to have been held for a longer period of time, thus

evincing the intent to kill. *See Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 629 (1995) (citations omitted) (noting death by strangulation is sufficient to infer specific intent required for conviction of first degree murder); *see also Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 445 (2006) (applying *Simmons* ). The expert further testified it would have been impossible for Diaz–Santiago to have killed Kayla during the brief time between when appellant left the apartment and when he returned.

▮ Viewing these facts in the light most favorable to the Commonwealth as the verdict winner, we conclude there was sufficient evidence for the jury to find appellant unlawfully killed Diaz–Santiago and Kayla with specific intent and malice, thus supporting his first degree murder convictions. Regarding appellant's weight claim, which parrots the boilerplate language he used to raise the issue in his post-trial motions, we hold his failure to provide any developed argument or legal citation results in waiver of this issue. *See Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786, 799 n. 12 (2008) (deeming inadequate appellant's single-sentence assertions in brief).

C.–D. *Sufficiency and Weight of the Evidence in Support of Aggravating Factors*

In a three-sentence paragraph devoid of citation or developed argument, appellant generally challenges the sufficiency of the evidence in support of the aggravating circumstances found during his penalty phase. He specifically claims "the evidence presented was circumstantial and not legally sufficient to sentence [a]ppellant to [d]eath." Appellant's Brief, at 21. In the alternative, appellant claims, in one sentence, that the death sentences were against the weight of the evidence.

▮ As previously noted, when a death sentence is imposed, we are required to review the sufficiency of the evidence supporting the finding of aggravating circumstances. *See* 42 Pa.C.S. § 9711(h)(3)(ii); *Dick,* at 958 (citations omitted). Thus, despite appellant's paltry offering in terms of argument and supporting case law, we will review the suffi-

ciency claim; however, his weight claim is again boilerplate, undeveloped, and thus waived. *See Steele*, at 799 n. 12.

■ Here, the jury found two aggravating circumstances regarding Kayla's murder: appellant was convicted of another murder committed before or at the time of the instant offense, 42 Pa.C.S. § 9711(d)(11), and the victim was a child under 12 years of age, *id.*, § 9711(d)(16). Regarding Diaz–Santiago's murder, the jury found one aggravating circumstance: appellant was convicted of another murder committed before or at the time of the murder. *Id.*, § 9711(d)(11).

The Commonwealth has the burden of proving the existence of all applicable aggravating circumstances beyond a reasonable doubt. *Id.*, § 9711(c)(1)(iii); *Johnson*, at 1039 (citation omitted). Here, following the guilt phase, appellant was convicted of both Diaz–Santiago's and Kayla's murders. Section 9711(d)(11)'s aggravating circumstance is applicable if the defendant murders two people in the same criminal episode. *See Commonwealth v. Hairston*, 603 Pa. 660, 985 A.2d 804, 809 (2009) (citation omitted). As the two murders in this case were part of the same criminal episode, there was sufficient evidence to support a finding of § 9711(d)(11)'s aggravating circumstance for each of them. Additionally, Kayla was five years old when she was killed; as § 9711(d)(16) requires the victim be under 12 years old and appellant does not dispute Kayla's age, there was sufficient evidence to support this aggravating circumstance. *See Commonwealth v. Chambers*, 602 Pa. 224, 980 A.2d 35, 59–60 (2009). Accordingly, we conclude sufficient evidence supports all of the aggravating circumstances found by the jury.

### E. *Jury's Weighing of Aggravating and Mitigating Factors*

■ Appellant's entire argument consists of a single sentence, absent citation or specific argument, indicating his belief the mitigating circumstances outweighed the aggravating ones in his case. Aside from the fact this dearth of content renders the claim incapable of being reviewed, we note:

There is no legal mechanism by which a sentence of death may be overturned by this Court on the basis of an improper weighing of aggravating circumstances and mitigating circumstances because our authority to vacate a death sentence is circumscribed by the death penalty statute, specifically 42 Pa.C.S. [§ ] 9711(h)(3).... This restriction on our authority has caused this Court to reiterate many times that it is exclusively the function of the jury in the first instance to decide whether aggravating and mitigating circumstances exist and then whether the aggravating circumstances outweigh any mitigating circumstances.... Consequently, the weighing process is "exclusively" a question for the factfinder, be it a court or jury.

*Commonwealth v. Reyes*, 600 Pa. 45, 963 A.2d 436, 441 (2009) (citations omitted). Accordingly, no relief is available for this claim.

### F. *Inquiry Pursuant to 42 Pa.C.S. § 9711(h)(3)*

Appellant contends the photograph of Kayla's body was improperly admitted and inflamed the jury's passion, his death sentence being the product of such passion.

Under § 9711(h)(3) of the death penalty statute, this Court is required to conduct a statutory review of a death sentence and to affirm such sentence unless:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)[.]

42 Pa.C.S. § 9711(h)(3).

The disposition of the discrete claim appellant raises depends on whether the color photograph of Kayla's body was admissible; that issue was waived by trial counsel's failure to object, which appellant raises as an ineffectiveness claim in issue V. Because the specific claim regarding the photograph's admissibility has been waived, we decline to rule on it at this juncture, instead dismissing it without prejudice to appellant's right to pursue it under the Post Conviction Relief Act

(PCRA). *See Chambers,* at 59 & n. 12 (citations omitted) (applying *Grant* and declining to review, on direct appeal, waived issue deriving from counsel's strategic decisions; dismissing ineffectiveness claim raised under guise of statutory review, without prejudice to appellant to raise claim under PCRA); *see also Commonwealth v. May,* 612 Pa. 505, 31 A.3d 668, 675-76 (2011) (citations omitted) (applying *Chambers* to preclude consideration of claims involving instances that could have been objected to by trial counsel, without prejudice to pursue them as ineffectiveness claims under PCRA).

 Regarding our mandatory review under § 9711(h)(3), with the exception of the claim deferred until collateral review, we have reviewed the record and conclude the death sentences were not the product of passion, prejudice, or any other arbitrary factor. As detailed in our disposition of issues A. and C., *supra,* the sentences were based on sufficient evidence that appellant intentionally killed Diaz–Santiago and Kayla with malice, and there was sufficient evidence to support the finding of the aggravating circumstances in both § 9711(d)(11) and § 9711(d)(16).

## G. *Death Penalty as Cruel and Unusual Punishment*

Appellant's entire argument consists of two sentences, devoid of any citation to case law: "The [a]ppellant respects the current caselaw finding that the [d]eath [p]enalty is not [c]ruel and [u]nusual [p]unishment. Nevertheless, the [a]ppellant raises this challenge so as to preserve the issue if there were a change in caselaw at any future time." Appellant's Brief, at 23.

In *Commonwealth v. Walter,* 600 Pa. 392, 966 A.2d 560 (2009), we held the appellant waived her constitutional claim concerning the death penalty by failing to cite case law or make any argument. *See id.,* at 566 ("Appellant simply asserts one constitutional claim after the other, with no legal rationale or authority for any of them."). We agreed with the trial court "that all of [the a]ppellant's claims either h[ad] been rejected by this Court or [were] incapable of review[,]" con-

cluding to the extent the appellant raised the same issues she had before the trial court, that court properly denied such claims. *Id.*

Likewise, we hold appellant's two-sentence synopsis of his claim, which he admits is raised solely for purposes of issue preservation, is insufficient to permit review. *See Steele,* at 799 n. 12; *see also Briggs,* at 342 (citations omitted) (rejecting appellant's attempt to incorporate by reference brief authored by other attorney in support of constitutional challenge to death penalty, instead of developing coherent argument with proper citation to relevant case law, as required by appellate rules). Furthermore, the trial court aptly disposed of this claim in its opinion addressing appellant's omnibus pretrial motion, noting both this Court and the United States Supreme Court have rejected constitutional challenges to the death penalty. *See* Trial Court Opinion, 11/18/08, at 10, 12 (citing *Baze v. Rees,* 553 U.S. 35, 62, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (holding Kentucky's three-drug method of lethal injection does not violate Eighth Amendment); *Gregg v. Georgia,* 428 U.S. 153, 177, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (observing framers of federal constitution did not consider death penalty to be *per se* violation of Eighth Amendment); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 969 (1982) (holding death penalty is not cruel punishment within proscription of Pa. Const. art. I, § 13), *abrogated on other grounds by Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003)); *see also Briggs,* at 343–44 (applying *Baze* to Pennsylvania's method of capital punishment, lethal injection); *Commonwealth v. Flor,* 606 Pa. 384, 998 A.2d 606, 642–43 (2010) (citations omitted) (same). Accordingly, appellant is not entitled to relief on this claim.

H. *Constitutionality of Death Penalty Sentencing Scheme*

As in his previous issue, appellant presents us with two sentences, repeating verbatim his acknowledgment of the status of the law regarding the constitutionality of Pennsylvania's capital sentencing scheme and his concession that issue preservation is his sole aim. He does not specify how any

particular provision of Pennsylvania's death penalty statute, 42 Pa.C.S. § 9711, offends the federal or state constitutions.

For the same reasons, we hold he has not presented argument sufficient to permit review. *See Briggs*, at 342; *Walter*, at 566; *Steele*, at 799 n. 12. In ruling on appellant's omnibus pre-trial motion, the trial court addressed the constitutionality of 42 Pa.C.S. § 9711, noting this Court has upheld the sentencing scheme on various constitutional grounds. *See* Trial Court Opinion, 11/18/08, at 10–11 (citing *Commonwealth v. Fletcher*, 580 Pa. 403, 861 A.2d 898, 912–13 (2004) (citations omitted) (holding § 9711(d)(11)'s aggravating factor does not violate Eighth Amendment or Due Process Clause); *Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119, 1130 (1993) (citations omitted) (holding § 9711 is constitutional with respect to equal protection, separation of powers, and procedural due process); *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101, 1111 (1988) (holding, absent showing of prosecutorial abuse of discretion, § 9711 does not violate equal protection); *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689, 698 (1986) (rejecting vagueness and overbreadth challenge to § 9711(d)); *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656, 670 (1986) (holding, absent showing of prosecutorial abuse of discretion, § 9711 does not violate Eighth Amendment)). Indeed, *Zettlemoyer* held "the sentencing procedures adopted by the General Assembly and set forth at [§ ] 9711 … are permissible under the Constitutions of this state and of the United States." *Zettlemoyer*, at 969. Thus, appellant is not entitled to relief on this claim.

### I.–Y. *Ineffectiveness of Counsel Claims*

In his remaining issues, appellant claims trial counsel was ineffective in connection with litigation of the guilt phase. The trial court included these issues in the evidentiary hearing on appellant's post-sentence motions, electing to proceed under *Bomar* and address the ineffectiveness claims on direct review. Recently, this Court examined *Bomar's* continued viability and disapproved of the expansion of its exception to the general rule in *Grant*. *See Commonwealth v. Holmes*, 621 Pa.

595, 79 A.3d 562, 563 (2013). *Holmes* limited *Bomar's* exception to its pre-*Grant* facts but recognized two specific exceptions to *Grant,* falling within the trial court's discretion: (1) "where a discrete claim . . . of trial counsel ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice[,]" *id.;* or (2) "where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness . . . if . . . there is good cause shown, and . . . the unitary review so indulged is preceded by the defendant's knowing and express waiver of . . . PCRA review[,]" *id.,* at 564 (footnote omitted).

▇▇▇ Here, the trial court proceeded under *Bomar*—a process we have since disapproved. Faced with the same circumstances in *Commonwealth v. Stollar,* 624 Pa. 107, 84 A.3d 635 (2014), we noted, "Such [ineffectiveness] claims must now be deferred to PCRA review, whereupon there will be an opportunity for greater development than that which occurred in the post-trial proceeding before the trial court here." *Id.,* at 652. Accordingly, we dismissed the appellant's ineffectiveness claims raised on direct appeal, without prejudice to his raising them in a timely PCRA petition. *Id.; see also Commonwealth v. Arrington,* 624 Pa. 506, 86 A.3d 831, 857 (2014) (holding where trial court did not have benefit of *Holmes* decision and thus did not engage in analysis regarding whether ineffectiveness claims fell into either exception to general rule of deferral, appellant should have opportunity to pursue all ineffectiveness claims, not merely ones set forth in direct appeal; therefore, ineffectiveness claims were dismissed without prejudice to appellant to raise them in subsequently filed PCRA petition). We do the same now, dismissing appellant's remaining claims pertaining to trial counsel's stewardship, without prejudice to him to raise them on collateral review should he so choose.[3]

3. Lead trial counsel died prior to the filing of appellant's post-trial motions, and we recognize the difficulty this circumstance presents in assessing counsel's rationale for his tactics and in discerning the basis for his omissions. This was the trial court's reason for reviewing the claim at the post-trial motion juncture. Indeed, as articulated in *Holmes,* a trial court might now find, in its discretion, the situation

The convictions of first degree murder and sentences of death are affirmed, and the Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i). Jurisdiction relinquished.

Former Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices BAER, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

Appellant has raised twenty-five claims, of which seventeen should be delayed to collateral review under *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), because they rely on an assertion that trial counsel was ineffective. Appellant also notes that an additional two issues—in which he challenges the constitutionality of the death penalty generally, as well as Pennsylvania's death-sentencing scheme—are meritless. This leaves six issues, most of which include an argument section consisting of one or two conclusory sentences with no citation to the record or to authority. For example, Issue E is entitled "Weighing of Aggravating and Mitigating Factors." The argument (if it can be called that) consists of a single sentence stating that Appellant believes the mitigating factors outweighed the aggravating factors. *See* Brief for Appellant at 21.

In light of this lack of development, I find the present situation comparable to *Commonwealth v. Jordan*, 619 Pa. 513, 65 A.3d 318 (2013), where the Court noted similar briefing deficiencies and delayed oral argument until a new, more

presents good cause to address the ineffectiveness claims on direct review. Such option was not available, however, at the time of its decision to proceed under *Bomar*—a practice which has been disapproved. Therefore, we adhere to *Holmes*, which holds the optimum time to review ineffectiveness claims is on collateral review, which allows a more thorough development of such claims than at the post-trial motion stage.

substantial, brief was filed. *See Commonwealth v. Jordan*, No. 604 CAP, *Order* (Pa. Feb. 28, 2011) (describing the appellate brief as "inadequate for a matter of this magnitude," where it failed to supply references to the record or to authority, or to "present arguments ... that may be capable of review").

In a similar case where re-briefing was not ordered, this Court disposed of the appeal by dismissing many of the claims as "unintelligible," underdeveloped, "vague and confusing," "waived," "incomprehensible," or "incapable of review." *Commonwealth v. Walter*, 600 Pa. 392, 397, 402, 404, 966 A.2d 560, 563, 566, 567 (2009).[1] The Court's opinion in the present matter reads similarly to the one in *Walter. See, e.g.,* Majority Opinion, at 614–15, 93 A.3d at 837 ("Appellant's brief is replete with beyond-boilerplate allegations containing sparse argument and even less citation to supporting authority or identification of pertinent portions of the record."). Notably, however, in *Walter* the defendant lodged a post-conviction petition, and, apparently based on the clear incompetence of direct appellate counsel, the post-conviction court reinstated Walter's direct-appellate rights, leading to a second appeal. *See Commonwealth v. Walter*, No. 645 CAP (submitted May 2, 2014).

Given the above, our present failure to require adequate briefing risks the type of serial proceedings which occurred in *Walter.* More broadly, this case implicates a continuing concern pertaining to the failure on the part of some advocates "to provide professional services necessary to secure appellate review on the merits of a capital defendant's or petitioner's claims." *Johnson*, 604 Pa. at 197–98, 985 A.2d at 928 (Saylor, J., concurring). I believe that our current *ad hoc* approach, whereby we dismiss most claims as unreviewable in some cases and remand for the filing of an adequate brief in others, is problematic as, for one thing, it tends to undermine the objective of treating similarly-situated litigants in a consistent

1. *See also Commonwealth v. Johnson*, 604 Pa. 176, 192–93, 985 A.2d 915, 925 (2009) (observing that appellate review was precluded where the argument section consisted of a single sentence followed by a list of citations to trial transcript pages without any explanation of how the content appearing at those pages supported the claim).

manner. Overall, it seems to me that when this Court is faced with blatant ineffectiveness—particularly in a capital appeal—it ill behooves us to treat the appeal in the ordinary course rather than require at least minimally adequate advocacy as a precondition to resolution of the appeal.

As for the present case, I would conclude that Appellant's presentation is so inadequate as to trigger the need for a remand for re-briefing or substitution of counsel if necessary. That being the case, I would require such a remand rather than deciding the appeal at this juncture.