**[J-65-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 786 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated August 26, 2019, entered on August 27, 2019, in the Court of Common Pleas, Allegheny County, Criminal Division at No. CP-02-CR-0009056-2001 |
| v. | : | |
| | : | |
| | : | |
| KENNETH HAIRSTON, | : | |
| | : | SUBMITTED: July 28, 2020 |
| Appellant | : | |

**OPINION**

**JUSTICE DONOHUE**                                                    **DECIDED: April 29, 2021**

In this capital PCRA appeal, Kenneth Hairston ("Hairston") challenges the order of the Court of Common Pleas of Allegheny County dismissing his petition for relief filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546 ("PCRA"). Hairston requests that this Court grant PCRA relief on his claims, inter alia, that the death penalty is unconstitutional under the Eighth Amendment to the United States Constitution and Article I, Section 13 of the Pennsylvania Constitution, and that his trial counsel was ineffective for allowing the jury to consider a non-statutory aggravating factor in reaching its verdict of death. For the reasons that follow, we affirm the PCRA court's denial of relief.

On direct appeal, this Court described the factual background underlying Hairston's convictions for murdering his wife and son:

On May 21, 2000, [Hairston] arrived at the apartment of his step-daughter, Chetia Hurtt, with a handgun he was not licensed to carry. When he was let into the apartment, [Hairston] threatened to kill Hurtt, her boyfriend, Jeffrey Johnson, who was also present, and himself. After [Hairston] demanded Mr. Johnson leave the apartment, he pointed the gun at Hurtt, pushed her down, and attempted to remove her clothes. Meanwhile, Mr. Johnson informed police about what was occurring, and the police responded immediately.

When they arrived at the apartment, they found [Hairston], half-naked, and recovered his gun. As the police were bringing [Hairston] out of the apartment, he attempted to escape. During the course of the ensuing investigation, Ms. Hurtt informed police that [Hairston] had been assaulting her for years and making threats against her family. She agreed to press charges. As a result of these events, [Hairston] was charged with rape, attempted rape, attempted escape, and related crimes. According to Ms. Hurtt's subsequent testimony, following his arrest [Hairston] threatened to harm himself and his family if Ms. Hurtt revealed his past assaults and persisted in pressing charges.

As the time of [Hairston's] rape trial drew near, [Hairston] acted on his threats. On June 11, 2001, two weeks before his trial for assaulting Ms. Hurtt was scheduled to begin, he directed the school bus company of his autistic teenage son, Sean, not to pick him up for school. Later that day, firefighters responded to a report of smoke coming from the home [Hairston] shared with his wife, Katherine, Sean, and his wife's mother, Goldie Hurtt. When the firefighters gained entry, they discovered that the house was strewn with garbage and debris and the doors were barricaded. Once inside, they discovered Sean on the living room couch, and although they brought him out of the house alive, he later died at the hospital from blunt force trauma to the head. Firefighters discovered Katherine's body in the kitchen, and it was later determined that she too died from blunt force trauma to the head. Goldie Hurtt was rescued from the house, unharmed. [Hairston] was discovered in the kitchen with several self-inflicted puncture wounds to the neck and chest. When emergency responders removed him from the house, he was extremely combative.

At the hospital, [Hairston] indicated that he had killed his wife and started the fire, and that his motivation for doing so was anxiety and outrage over the pending rape allegations and

imminent trial on these charges. Eight days later, on June 19, 2001, [Hairston] further explained that he bludgeoned his wife and son with a sledgehammer, left the house with the weapon and went to a local bar, where he consumed several drinks, and returned home. Upon his return, he spread debris around the house, barricaded the doors, and poured gasoline around the basement floor, which was ignited by the water heater. He attempted to stab himself, and then lay down next to his wife's body. He explained that he intentionally piled debris around the house to fuel the fire and to "make sure that we were gone."

[Hairston] was charged with two counts of criminal homicide. Meanwhile, on December 14, 2001, [Hairston] was convicted of rape, sexual assault, burglary, attempted escape, and related charges resulting from his abuse of his step-daughter over a five year period from when Ms. Hurtt was fifteen to twenty-one, and from the charges for his conduct on May 21, 2000. At his murder trial, the Commonwealth argued that [Hairston] killed his wife and son to punish Ms. Hurtt for reporting to the authorities that Hairston held her at gun-point and attempted to rape her, and had raped her previously. At the penalty phase, the jury found two aggravating circumstances, and two mitigating circumstances.

*Commonwealth v. Hairston*, 84 A.3d 657, 662–63 (Pa. 2014) (some internal citations and a footnote omitted). On July 11, 2002, the trial court imposed a sentence of death.

Following trial and the expiration of time to file post-sentence motions, trial counsel withdrew. Subsequently, current counsel entered his appearance on August 22, 2005. *Id.* at 663. Upon counsel's request, the trial court granted Hairston additional time to file post-sentence motions, which he did. The trial court[1] considered and denied the post-sentence motions. *Id.* Hairston appealed to this Court. On direct appeal, we determined that the time to file post-sentence motions and an appeal had lapsed, *see* Pa.R.Crim.P.

---

[1] The Honorable Jeffrey A. Manning served as the judge for both the trial court and the PCRA court.

720(A)(3), and we held that all claims not associated with our automatic review of capital cases were not preserved. We affirmed. *Hairston*, 84 A.3d at 663.

Hairston thereafter filed a petition for relief pursuant to the PCRA, requesting reinstatement of his appellate rights nunc pro tunc based upon prior counsel's ineffective assistance in failing to timely file post-sentence motions. *Id.* The Commonwealth conceded that prior counsel was ineffective, and the trial court granted Hairston's request to file a notice of appeal nunc pro tunc.[2] *Id.*; Order, 11/15/2011. Hairston complied and raised numerous issues, all of which we denied, thus affirming Hairston's judgment of sentence. *Hairston*, 84 A.3d at 663-64, 678. The United States Supreme Court denied his petition for writ of certiorari on October 6, 2014. *Hairston v. Pennsylvania*, 574 U.S. 863 (2014).

On January 26, 2015, current counsel filed a PCRA (and a petition to amend the petition), and a motion for stay of execution. The PCRA court granted counsel permission to amend the petition, and it granted the motion to stay execution pending final disposition of the PCRA proceedings. Orders, 2/9/2015. After receiving several extensions, counsel filed an amended petition on January 30, 2017, to which the Commonwealth replied on May 30, 2018. The PCRA court issued a notice of intention to dismiss the petition pursuant to Pennsylvania Rules of Criminal Procedure Rule 909(B)(2)(a) on October 30, 2018, to which Hairston responded on February 19, 2019. Hairston's response included a motion for leave to file a supplemental amended PCRA petition and a proposed

---

[2] Despite the order reinstating Hairston's direct appeal rights, the governor signed a new notice of execution on November 22, 2011. At Hairston's request, the trial court granted a stay of execution, "pending final disposition of this matter on appeal." Trial Court Order, 12/9/2011.

amended petition, which he filed separately that same day. The supplemental amended petition challenged the constitutionality of the death penalty, highlighting a report issued by the Joint State Government Commission ("JSGC"). The Commonwealth filed a response on May 24, 2019, and the PCRA court issued a supplemental notice of intention to dismiss on June 19, 2019. On August 26, 2019, the PCRA court entered an order denying Hairston's petition for collateral relief, citing the reasons stated in its two notices of intention to dismiss.

On appeal to this Court, Hairston raises the following issues for our consideration:

I. Whether the death penalty is violative of the Eighth Amendment to the United States Constitution as well as Article I, § 13 of the Pennsylvania Constitution?

II. Ineffective Assistance of Counsel

A. Trial counsel's failure to challenge the verdict slip[3]

B. Appellate counsel's failure to challenge the verdict slip

C. Prosecutorial misconduct

D. Expert testimony regarding credibility

E. Expert testimony regarding Hairston's juvenile records

Hairston's Brief at 4–5.[4]

In reviewing a denial of PCRA relief, we look to whether the lower court's factual determinations are supported by the record and are free of legal error. *Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011). With respect to the PCRA court's legal

---

[3] Hairston also raises a claim that the jury found a non-statutory aggravating factor rendering its sentence illegal, which we address in connection with the ineffective assistance of counsel claims.

[4] We have reordered the issues for ease of resolution.

conclusions, we apply a de novo standard of review. *Id.* In reviewing credibility determinations, we are bound by the PCRA court's findings so long as they are supported by the record. The PCRA court's findings and the evidence of record are viewed in the light most favorable to the Commonwealth as the winner before the PCRA court. *Commonwealth v. Hanible*, 30 A.3d 426, 438 (Pa. 2011).

In considering an appeal of a denial of a hearing, we look to Pennsylvania Rule of Criminal Procedure 909. Rule 909 provides that the PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings." Pa.R.Crim.P. 909(B)(2). In order to obtain relief, the appellant must show that he or she "raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Commonwealth v. D'Amato*, 856 A.2d 806, 820 (Pa. 2004).

To succeed on PCRA appeal, a petitioner must establish that his or her conviction or sentence resulted from one or more of the circumstances enumerated in subsection 9543(a)(2). 42 Pa.C.S. § 9543(a)(2). Relevant to the present appeal, the circumstances include a violation of the Pennsylvania or United States Constitutions or ineffective assistance of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i)-(ii).

**I.     Constitutionality of the Death Penalty**

Hairston raises a multifaceted challenge to the constitutionality of the death penalty. He first presents a facial challenge,[5] asserting that it violates the constitutional prohibition against cruel and unusual punishments and that current standards of decency do not support its continued use. Hairston's Brief at 34-35. He also presents an as-applied challenge, arguing that the death penalty is unconstitutional as applied to all of Pennsylvania's current death row prisoners. In lodging his as-applied challenge, he draws support from the report issued by the JSGC, which points to ways in which the death penalty unfairly affects certain defendants based on, inter alia, race, geography and the type of counsel they secure. Hairston maintains that these inequities demonstrate that the death penalty is implemented in an arbitrary and capricious manner that violates constitutional norms.

**A.     Facial challenge**

Hairston's first challenge is that the death penalty violates the Eighth Amendment to the United States Constitution, which prohibits the infliction of "cruel and unusual punishment," and Article I, Section 13 of the Pennsylvania Constitution, which prohibits the infliction of "cruel punishments." Hairston's Brief at 21. He acknowledges that the United States Supreme Court has ruled repeatedly that the death penalty does not violate the Eighth Amendment to the United States Constitution, *see, e.g.*, *Gregg v. Georgia*, 428

---

[5] A facial challenge to the constitutionality of a statute is a claim alleging that a statute suffers an "ineluctable constitutional deficiency." *Clifton v. Allegheny County,* 969 A.2d 1197, 1229 (Pa. 2009). By contrast, an as-applied challenge to the constitutionality of a statute is one asserting that the statute, even though it may generally operate constitutionally, is unconstitutional in a defendant's particular circumstances. *See id.* at 1224.

U.S. 153 (1976) (plurality), and that the rights secured by Article I, Section 13 of the Pennsylvania Constitution are co-extensive with the prohibition against 'cruel punishments' as secured by the Eighth Amendment. *See, e.g.*, *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 967 (Pa. 1982), *abrogated on other grounds by Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003).

We begin with analysis under the Eighth Amendment. Hairston questions the continued viability of the death penalty because "the evolution of the Eighth Amendment jurisprudence has gradually been moving away from imposing the death penalty on individuals." Hairston's Brief at 25. Specifically, Hairston asserts that our current "civilized standards of decency" do not support the continued use of the death penalty. As evidence of this assertion, Hairston points out that twenty-two states have abolished the death penalty, a majority of nations have abolished or halted the death penalty, and Pennsylvania has maintained a moratorium on the death penalty since February 2015. *Id.* at 34–35.

The Supreme Court has stated that "[t]he constitutional prohibition against excessive or cruel and unusual punishments mandates that the State's power to punish 'be exercised within the limits of civilized standards.'" *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008). That standard, first announced by Chief Justice Warren in *Trop v. Dulles*, 356 U.S. 86, 100 (1958) (plurality), was more recently explained in *Roper v. Simmons*, 543 U.S. 551 (2005), as follows:

> As the Court explained in *Atkins [v. Virginia*, 536 U.S. 304 (2002)], the Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions. The right flows from the basic "'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" [*Id.*] at 311 (quoting *Weems v. United States*, 217 U.S. 349,

367, (1910)). By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons.

The prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual.

*Id.* at 560-61. Thus, when considering whether the death penalty constitutes a cruel and unusual punishment, we consider "evolving standards of decency" that mark the progress of our maturing society.

Hairston concedes, as he must, that in *Gregg*, the Supreme Court held that the death penalty did not violate evolving standards of decency. In so ruling, the Court in *Gregg* made two fundamental observations. First, the Supreme Court indicated that while prohibiting cruel and unusual punishments, the framers of the Constitution nevertheless expressly recognized the availability of capital punishment when due process is afforded. The Fifth Amendment to the Constitution states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury … nor be deprived of life, liberty, or property, without due process of law… ." *Gregg*, 428 U.S. at 177 ("It is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers[.]"). *See In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, – something more

than the mere extinguishment of life."). Second, the "evolving" nature of our standards of

decency is generally a decision left for state legislatures.

> Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.
>
> This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "(I)n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." The deference we owe to the decisions of the state legislatures under our federal system is enhanced where the specification of punishments is concerned, for "these are peculiarly questions of legislative policy."

*Gregg*, 428 U.S. at 175–76.[6]

Hairston asks us to focus on the ways in which Eighth Amendment protections

have expanded since *Gregg* was decided, including the enforcement of heightened

procedural restrictions on implementation of the death penalty. *See, e.g.*, *Lockett v. Ohio*,

438 U.S. 586 (1978) (providing that Eighth Amendment requires that a death penalty

---

[6] In a footnote, the *Gregg* plurality clarified that while courts must show great deference to legislative determinations regarding the citizenry's standards of decency, ultimately the issue of constitutionality is for the judiciary to decide. *Gregg*, 428 U.S. at 174 n.19 ("legislative measures" are "one important means of ascertaining contemporary values" but "cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power"); see also *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) ("legislative judgment" is only one factor in determining contemporary values. The Court considered legislative judgment to be "reliable objective evidence of contemporary values[,]" but is not determinative of the constitutionality of the death penalty.). *Id.*

statute not preclude consideration of any relevant mitigating factors); *Roberts v. Louisiana*, 428 U.S. 325 (1976) (holding that Eighth Amendment prohibits death penalty scheme that replaced discretionary jury sentencing with mandatory death sentences for certain crimes). Hairston emphasizes that the Court has also held that the death penalty is excessive when applied to certain crimes, *see, e.g.*, *Coker v. Georgia*, 433 U.S. 584 (1977) (prohibiting imposition of death sentence for crime of rape of adult woman), and to certain defendants. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551 (2005) (prohibiting imposition of death penalty against juveniles); *Atkins v. Virginia*, 536 U.S. 304 (2002) (prohibiting imposition of death penalty against persons with intellectual disabilities); *Thompson v. Oklahoma*, 487 U.S. at 815 (1988) (prohibiting imposition of death penalty against persons under fifteen years of age). Hairston contends that his circumstance is a natural extension of these cases, as the logical next step is for the High Court to acknowledge that the death penalty is excessive when applied to **any** defendant regardless of crime.

While the Supreme Court has increasingly limited the application of the death penalty to only the most serious offenders and most serious offenses, it has not provided any indication that it intends to rethink its jurisprudence in *Gregg* upholding the death penalty as a permissible punishment. No majority opinion has reconsidered its prior admonition that the Constitution expressly recognizes capital punishment or found that it is inherently inhuman and barbarous. In 2019, the Supreme Court reaffirmed the constitutionality of the death penalty, rejecting a claim that Missouri's lethal injection protocol was unconstitutional. *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019). In so doing, the Court again relied on the basic proposition that "[t]he Constitution allows capital

punishment[.]" *Id.* at 1122; *see also Glossip v. Gross*, 576 U.S. 863 (2015) (recognizing that "*Gregg* reaffirmed that the death penalty does not violate the Constitution"); *Baze v. Rees*, 553 U.S. 35, 47 (2008) (plurality) (rejecting a challenge regarding method of execution and stating that "capital punishment is constitutional"); *Roberts*, 428 U.S. at 331 (rejecting argument that death penalty is cruel and unusual punishment for the reasons stated in *Gregg*). As recently as July of 2020, the Supreme Court vacated a district court's preliminary injunction and allowed an execution to go forward. *Barr v. Lee*, 140 S.Ct. 2590, 2591-92 (2020) (per curiam).

Hairston's reliance on the courts of other states to ban the death penalty is unconvincing. We recognize that since *Gregg*, a number of states have outlawed the death penalty. We note, however, that these states have typically done so via **legislative** enactments rather than by court decisions applying an "evolving standards of decency" analysis of the type Hairston would have this Court apply here. Hairston directs our attention to certain state court decisions that have found the death penalty to be constitutionally deficient, but these cases do not support the position he takes in this case. For example, in *State v. Santiago*, 122 A.3d 1 (Conn. 2015), the Connecticut Supreme Court found that the death penalty did not comport with the state's "contemporary standards of decency." *Id.* at 11-12. The court did so, however, based upon the state legislature's enactment of a statute repealing the death penalty for all crimes committed on or after a certain date. The court stated that "following the enactment of [Public Act] 12–5, Connecticut's capital punishment scheme no longer comports with our state's contemporary standards of decency." *Id.* at 55.

Other cases cited by Hairston outlawed the death penalty solely based on the nature of the statutory sentencing scheme in those states. In *State v. Cline*, 397 A.2d 1309, 1311 (R.I. 1979), for example, the Rhode Island Supreme Court found unconstitutional a mandatory death penalty scheme providing that the death penalty was the automatic punishment, without consideration of mitigating factors, for any individual who commits murder while committed to certain types of confinement. *Id.* at 1311. In *Rauf v. State*, 145 A.3d 430, 432-34 (Del. 2016) (per curiam), the Delaware Supreme Court found that the state's sentencing scheme for capital cases violated the Sixth Amendment's right to jury trial. In *Commonwealth v. Colon-Cruz*, 470 N.E.2d 116, 124 (Mass. 1984), the Massachusetts Supreme Court found that implementation of the death penalty "impermissibly burden[ed] both the right against self-incrimination and the right to jury trial" guaranteed by the Massachusetts Constitution.

Turning to Article I, Section 13 of the Pennsylvania Constitution, this Court has repeatedly affirmed the constitutionality of the death penalty against challenges that it constitutes a "cruel punishment" under Article I, Section 13. *See, e.g.*, *Commonwealth v. Walter*, 119 A.3d 255, 293-94 (Pa. 2015); *Commonwealth v. v. Perez*, 93 A.3d 829, 844 (Pa. 2014). Article I, Section 13 of the Pennsylvania Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishment inflicted." In *Zettlemoyer*, the defendant argued that imposition of the death penalty was "inevitably" cruel punishment under Article I, Section 13. *Zettlemoyer*, 454 A.2d at 967. This Court responded that the same claim, when raised under the Eighth Amendment's proscription against "cruel and unusual" punishments, had been rejected by the U.S. Supreme Court in *Gregg*. *Id.* Adopting the Supreme Court's reasoning in *Gregg*, this Court concluded

that "the rights secured by the Pennsylvania prohibition against 'cruel punishments' are co-extensive with those secured by the Eighth and Fourteenth Amendments."[7]  *Id.*  In particular, we emphasized first that the framers of our Constitution, like their counterparts drafting the United States Constitution, did not believe that capital punishment was a "per se violation of the prohibition against 'cruel punishments.'"  *Id.* ("Article I, § 9 enacted simultaneously with Art. I, § 13, provides 'nor can [the accused in a criminal prosecution] be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land.'  Similarly, Art. I, § 10 provides '[n]o person shall, for the same offense, be twice put in jeopardy of life or limb... .'").

This Court likewise focused on the Supreme Court's admonition that our state's "evolving standards of decency" should generally be left to our General Assembly to decide.[8]  *Id.* at 968.  In this regard, we observed that in 1794, the General Assembly approved an act, the first of its kind among the states, creating degrees of murder with the death penalty confined to murder of the first degree.  *Id.*  From that time forward, this Commonwealth has always operated under some legislative enactment setting the penalty for at least some first-degree murders at death, except for brief periods caused by decisions of this Court, and in those instances the legislature always acted promptly

---

[7]  Although Hairston asserts that the death penalty is unconstitutional under Article I, Section 13, he has not performed an analysis under *Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991) in support of this position.

[8]  Following *Gregg*, *see supra* footnote 6, this Court remained mindful that it is our function to "insure that constitutional bounds are not overreached," while at the same time recognizing that it is the General Assembly's "primary responsibility in choosing between competing political, economic and social pressures." *Zettlemoyer*, 454 A.2d at 960 (quoting *Dennis v. United States*, 341 U.S. 494, 525 (1951) (Frankfurter, J., concurring in affirmance of judgment)).

to fill the gaps caused by those decisions. *Id.* As such, the General Assembly of this Commonwealth has, since its inception, consistently and continually expressed its conviction that the death penalty is, for at least some intentional killings, an appropriate and necessary form of punishment.

In sum, Hairston fails to present any compelling justification for altering our present course. We acknowledge that many states have found defects in the implementation of the death penalty, but Hairston fails to demonstrate that those examples present convincing new evidence that the death penalty is cruel and unusual punishment violative of the Eighth Amendment or of Article I, Section 13. In addressing a similar challenge to the constitutionality of the death penalty just five years ago, we observed that "Appellant's argument, relying on a minority of states which have abolished the death penalty and a few select international legal documents condemning or calling for restrictions on the death penalty, [was not] sufficient to warrant our reassessment, at this juncture, of the constitutionality of the death penalty *per se*." *Walter,* 119 A.3d at 294. Likewise today, Hairston's arguments are not sufficient to warrant reconsideration of the jurisprudence announced by the Supreme Court in *Gregg* and this Court in *Zettlemoyer*.

### B. As-applied Challenge

Hairston also presents an as-applied challenge to the constitutionality of the death penalty, arguing that "as applied to Pennsylvania's current death row prisoners, Pennsylvania's death penalty is unconstitutional[]" in that it "has exceeded Pennsylvanian's standard of decency[.]" Hairston's Brief at 51, 52. In denying this claim, the PCRA court stated that it was bound by the precedent in which this Court and the

United States Supreme Court have denied similar challenges to the constitutionality of the death penalty.[9]

Hairston claims that unconscionable defects in Pennsylvania's practices and procedures of capital punishment render it unconstitutional as applied to Pennsylvania's current death row prisoners. Hairston's Brief at 37-52. He states that the current system has exonerated "twice as many death row prisoners as it has executed[,]" and argues that death sentences are "primarily attributable to bad lawyering, geographical happenstance, racial disparities, and prosecutorial caprice." *Id.* at 38 (citing JSGC Report at 3); *see also id.* at 46 ("the high appellate and post-conviction reversal rate and the low re-sentencing to death rate demonstrate that the imposition of a death sentence is an arbitrary event in Pennsylvania based not on culpability factors but on identifiable defects in the capital punishment system."). In support of his specific criticisms of Pennsylvania's practices and procedures, he cites almost exclusively to the JSGC report of June 26, 2018, "which identified unconscionable defects" in Pennsylvania's capital punishment. *Id.* at 37.

Hairston describes various of the defects set forth in the JSGC report. First, the death penalty is significantly more expensive than life imprisonment. *Id.* at 38-39.[10] Second, Hairston explains that the death penalty is "disproportionately applied to people with low and impaired intellectual functioning[.]" *Id.* at 40-41. In that vein, he draws

---

[9] Trial Court's Supplemental Notice of Intention to Dismiss, 6/19/2019, at 1 (citing *Commonwealth v. Perez*, 93 A.3d 829 (Pa. 2014), *Commonwealth v. Flor*, 998 A.2d 606 (Pa. 2010) and *Baze v. Rees*, 553 U.S. 35 (2008)).

[10] Notably, the death penalty's expense is the one defect that Hairston connects directly to his own situation, complaining that his case is a "prime example of needless expenditures and resources." *Id.* at 39. He does not, however, explain how additional expenses (borne by the Commonwealth) make his sentence unconstitutional.

attention to the JSGC report's findings that "approximately one quarter of the inmates on death row [have] an active mental disorder" requiring psychiatric treatment and/or monitoring, and an additional thirty percent of the inmates on death row had a recent need for mental health treatment. *Id.* at 40.

Next, the JSGC report found geographical and racial biases. *Id.* at 42-44. With respect to geographical bias, "the principal determinant of whether a defendant will be sentenced to death is … the county in which he commits his crime." *Id.* at 42. Whereas Philadelphia County prosecutors have historically sought the death penalty "aggressively," Allegheny County prosecutors have "sharply limited its use." *Id.* at 42-43. With regard to racial bias, Hairston states that the JSGC report found that prosecutors in the Commonwealth disproportionately seek the death penalty against black citizens. *Id.* at 44. The race of the victim is also a determinative factor, in that defendants are less likely to receive the death penalty when the victim is black than when the victim is white, according to the JSGC report. *Id.*

Further, the JSGC report found that prosecutors have "vast discretion" about who to arrest and charge with murder and how to prosecute death penalty cases. *Id.* Moreover, there is no statewide standardized process for funding, training and supervising defense counsel. *Id.* at 46-48. In this regard, the JSGC's report concluded that defendants experience discrepancies in charging decisions and outcomes related to whether they are represented by private counsel versus a public defender. *Id.* at 47-48. He complains that the "type of representation a defendant receives[,]" a factor untethered to culpability, "has an outsized impact on whether the defendant is sentenced to death[.]" *Id.* at 47.

Finally, Hairston complains that, per the JSGC report, the "breadth of aggravating circumstances in Pennsylvania contributes to the risk of unfair and arbitrary application [of the death penalty] by failing to adequately narrow the class of persons subject to the death penalty[,]" while mitigating circumstances "are overly restrictive and thus increase the risk of arbitrarily selecting defendants who receive the death penalty." *Id.* at 49. With regard to jury instructions, Hairston observes that the JSGC report "raises concerns about the ability of jurors to understand the jury instructions provided to them at a capital sentencing trial." *Id.* (quoting JSGC Report at 49).

Based on the JSGC report, Hairston argues that the death penalty in Pennsylvania is arbitrarily imposed. *Id.* at 50. He claims that the JSGC report demonstrates that the system, as implemented from 1970 through today, "failed to meet the constitutional standard required by the Pennsylvania Constitution." *Id.* at 51. Arguing that Pennsylvania's capital punishment system is broken and that society is trending towards abolition of the death penalty, Hairston asks this Court "to declare that, as applied to Pennsylvania's current death row prisoners, Pennsylvania's death penalty is unconstitutional pursuant to the Eighth Amendment, the Fourteenth Amendment, Article I, Section 13 and Article I, Section 9." *Id.* at 52.

In past cases addressing as-applied challenges to the constitutionality of the death penalty, we have acknowledged that an appellant must demonstrate that he is impacted by the alleged defect in order to be entitled to relief from his death sentence. In *Commonwealth v. Crews*, 717 A.2d 487 (Pa. 1998), for instance, appellant Paul David Crews alleged that trial counsel provided ineffective assistance for failing to challenge the constitutionality of the death penalty. *Id.* at 488-89. Specifically, he complained that trial

counsel should have asserted a claim that the "death penalty is disproportionately applied to the poor[.]" *Id.* at 489. In rejecting his claim, we observed that Crews offered no evidence in support of his claim. Moreover, Crews failed to demonstrate how prosecutorial discretion was abused with regard to seeking the death penalty. *Id.* Finally, we stated that Crews "fail[ed] to articulate how the death penalty is unconstitutional **as applied to him**." *Id.* (emphasis added). Because he failed to allege (or demonstrate) that he, himself, was poor and thus disproportionately impacted by the death penalty, he could not succeed on his as-applied challenge to the constitutionality of the death penalty.

Similarly, in *Commonwealth v. Le*, 208 A.3d 960 (Pa. 2019), we faced a challenge that "the death penalty is administered in an 'arbitrary and capricious' manner" because it is imposed upon offenders who refuse to accept a plea deal to life without the chance of parole. *Id.* at 981. We acknowledged appellant's argument that "many of the individuals who choose to go to trial instead of pleading guilty, and who may ultimately be sentenced to death, are 'too encumbered by mental illness, intellectual limitations, or too immature to offer or accept a plea to life without parole.'" *Id.* We concluded, however, that his as-applied challenge failed because Le did not allege (or prove) that **he himself** was offered a plea of a life sentence that he refused to accept. *Id.* at 982 n.21. We observed that appellant "does not suggest his decision to go to trial was the result of his mental illness, intellectual limitations, or immaturity, nor does he suggest that he was offered a plea of a life sentence that he refused to accept. Indeed, … [a]ppellant fails to show that the Commonwealth's decision to seek a capital sentence 'had any other basis than the facts that gave rise to the jury's finding of five aggravating circumstances." *Id.*

Hairston argues that the system is unconstitutional as-applied, complaining of the manner in which it has been imposed and implemented upon Pennsylvania's current death row prisoners. Hairston's Brief at 51-52. Importantly, however, he does not assert that he himself has been impacted or affected by the defects in Pennsylvania's capital punishment system identified in the JSGC report. Although he asserts that the death penalty is arbitrarily imposed against people of low or impaired intellectual functioning, he does not argue that he is of low or impaired intellectual functioning. He does not assert that he is a victim of geographical bias; nor could he, as his crimes were committed in Allegheny County, where the JSGC report emphasized that prosecutors sharply limit the use of the death penalty. *Id.* at 41-42.

With regard to racial bias, Hairston does not contend that his conviction and death sentence resulted from racial bias against him or the race of the victim. Likewise, Hairston does not advance any argument that his conviction and sentence resulted from the lack of statewide-standardized process for funding, training and supervising defense counsel and/or because of discrepancies between private and public counsel. Nor does Hairston assert that his case resulted from an arbitrary exercise of prosecutorial power or from overly broad aggravating circumstances. To the contrary, he does not contend that at trial he was in any manner prevented from presenting evidence, including with respect to non-statutory mitigating circumstances. Finally, Hairston does not suggest that the jury instructions provided at trial were confusing or difficult to understand.

As a result, we must conclude that Hairston's as-applied challenge fails. We thus discern no error in the trial court's determination that Hairston was not entitled to relief.

## II. Ineffective assistance of counsel

Hairston's remaining claims challenge the representation of trial and appellate counsel as ineffective. The principles governing claims of ineffective assistance of counsel are well settled. Counsel is presumed to be effective, and the petitioner bears the burden of proving that counsel's assistance was ineffective by a preponderance of the evidence. *Commonwealth v. Hanible*, 30 A.3d 426, 439 (Pa. 2011). To prevail on a claim of ineffective assistance of counsel, the petitioner must plead and prove the following three elements: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) petitioner suffered prejudice as a result of counsel's action or inaction. *Strickland v. Washington*, 466 U.S. 668 (1984); *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001). To establish prejudice, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. *Commonwealth v. Chmiel*, 30 A.3d 1111, 1127–28 (Pa. 2011). Because a petitioner's failure to satisfy any of the above-mentioned elements is dispositive of the entire claim, a court need not analyze the elements in any particular order. Failure to satisfy one element is dipositive.

### A. Trial counsel's failure to challenge the verdict slip

At the guilt phase of Hairston's trial, his stepdaughter, Chetia Hurtt, testified regarding the circumstances of his attempted rape of her, which had taken place approximately one year prior to his killing of her mother and brother. At the penalty phase, Chetia Hurtt testified to prior instances of sexual abuse, beginning at age fourteen. The parties then stipulated that as a result of the actions testified to by Chetia Hurtt, Hairston

was convicted of four felonies, including one count of attempted rape, one count of rape, and two counts of involuntary deviate sexual intercourse.

The Commonwealth submitted to the trial court two aggravating circumstances that it intended to prove: (1) 42 Pa.C.S. § 9711(d)(9) ("The defendant has a significant history of felony convictions involving the use or threat of violence to the person;"), and (2) 42 Pa.C.S. § 9711(d)(11) ("The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue"). Part A of the sentencing verdict slip listed the potential aggravating circumstances for the jury to consider as follows:

> 1. The following aggravating circumstances are submitted to the jury and must be proven by the Commonwealth beyond a reasonable doubt:
>
> > a) The defendant has a significant history of felony convictions involving the use or threat of violence to the person. 42 Pa.C.S.A. 9711(d)(9)
> >
> > b) The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue[.] 42 Pa.C.S.A. 9711(d)(11)

Verdict Slip (Victim: Kathy Hairston). It also listed the mitigating circumstances submitted by Hairston. The trial court instructed the jury as follows:

> In this case, under the sentencing code, only the following matters, if proven to your satisfaction beyond a reasonable doubt, can be aggravating circumstances. There are two. One, that the defendant has a significant history of felony convictions involving the use or threat of violence to the person. In deciding whether the defendant has a significant history, the factors you should consider include the number of previous convictions, the nature of the previous crimes and their similarity to or relationship with the murders in this case.

The fact that all the previous convictions were based on a single incident or transaction or series of transactions or occur at a single trial does not by itself prevent them from being a significant history of convictions. The four convictions upon which this aggravating circumstance is found have been placed in the record by the stipulation of the parties. They are a criminal attempt to commit rape on May 21, 2000; at least one act constituting rape that occurred sometime between May 30, 1995 and May 21, 2000, at least one act of involuntary deviate sexual intercourse that occurred sometime between May 30, 1995 and May 21, 2000; and at least one act of involuntary deviate sexual intercourse that occurred sometime between 1993 and May 29, 1995.

Chetia Hurtt, the victim of those crimes, has testified to other allegations, to other offenses allegedly committed by the defendant that have not resulted in separate felony convictions.

I have permitted this testimony for one reason and one reason alone. If you should find beyond a reasonable doubt that the four felonies that I have just listed establish this aggravating circumstance, you may then consider Ms. Hurtt's testimony for the sole purpose of deciding how much weight you give to this particular aggravating circumstance.

N.T., 4/18/2002, at 229–30. In filling out the verdict slip,[11] the jury indicated a verdict of

death and stated the aggravating factors as

The 4 felony convictions that have been placed in the record by stipulation

The murder of Sean Hairston,

Verdict Slip (Victim: Kathy Hairston).

Hairston contends that trial counsel provided ineffective assistance in failing to

object to the verdict slip, as the jury did not use the "significant history" language in 42

Pa.C.S. § 9711(d)(9) and did not reflect that the jury had in fact reached a determination

---

[11] The jury also found two mitigating circumstances: "When the defendant killed, he acted under mental or psychological disturbance," and "The defendant was a good neighbor to those in his community." Verdict Slip (Victim: Kathy Hairston).

that he had a "significant history of felony convictions." Hairston's Brief at 53. Hairston acknowledges that his convictions for the sexual assaults he committed against his step-daughter were presented to the jury as a stipulation and offered under Section 9711(d)(9) to demonstrate that "[t]he defendant has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S. § 9711(d)(9); Hairston's Brief at 56. He complains that when the jury filled out the verdict slip, it did not use this precise language, i.e., "a significant history of convictions," but rather merely referred to the stipulation itself, without confirming that it found beyond a reasonable doubt that his four convictions constituted a "significant history of convictions." Hairston's Brief at 59. In support of this contention, he emphasizes the prosecutor's arguments to the jury regarding Chetia Hurtt's "suffering," and argues that the prosecutor strongly implied to the jury that it could find her suffering to be a non-statutory aggravating circumstance. *Id.* at 55-56. Hairston would require a jury, when identifying the aggravating factors found to have been proven beyond a reasonable doubt, to use the precise language in the statute, i.e., that it found "a significant history of felony convictions... ." *Id.* at 66.

In arguing that the jury's failure to use the precise terms of the statutory scheme was fatal, Hairston cites to *Commonwealth v. May*, 656 A.2d 1335 (Pa. 1995). In *May,* the Commonwealth presented evidence of the aggravating factor that the "[t]he defendant committed a killing while in the perpetration of a felony[,]" 42 Pa.C.S. § 9711(d)(6), the felony being **attempted rape**. *Id.* at 1344. However, the jury verdict slip indicated that the jury found that defendant committed the killing "during the perpetration of a felony, the felony being **rape**." *Id.* (emphasis added). On appeal, this Court found that the verdict slip was invalid based on the variation between the evidence presented (attempted rape) and the jury's finding (rape). We declined to speculate as to the jury's intention. We therefore remanded for a new sentencing hearing. *Id.* at 1345. Hairston cites to *May* in

support of his contention that "courts are not permitted to assume what the jury considered or what they meant," but instead the jury must "adhere to the mandatory language" and state with precision the aggravating factor found. Hairston's Brief at 67-68.

Hairston also relies on *Commonwealth v. Rizzuto*, 777 A.2d 1069 (Pa. 2001), and *Commonwealth v. Knight*, 156 A.3d 239 (Pa. 2016), in which we addressed the provision in 42 Pa.C.S. § 9711(e)(1) that "mitigating circumstances shall include … (1)[t]he defendant has no significant history of prior criminal convictions." In the first of those cases, *Rizzuto*, the Commonwealth stipulated that the defendant had no significant history of prior criminal convictions, yet the jury failed to find the mitigating factor on the verdict slip. *Rizzuto*, 777 A.2d at 1088. Based on the mandatory language of Section 9711(e)(1), we concluded that, "where the absence of a prior record is not in dispute, … the sentencing jury has no discretion whether or not to find the existence of this fact as a mitigating factor." *Id.* at 1089. We explained that "[i]f we would grant the jury discretion to ignore stipulations of fact, we would be granting the right to arrive at a sentencing verdict in an arbitrary and capricious fashion." *Id.* According to Hairston, in *Rizzuto* we held that courts "should not look to extrinsic factors" or make "any assumption as to what the jury may have been considering absent the words of the verdict slip." Hairston's Brief at 63–64. As Hairston points out, we applied the rule in *Knight*, again remanding for a new sentencing hearing because a jury failed to find that "the defendant has no significant history of prior criminal convictions," 42 Pa.C.S. § 9711(e)(1), despite that the Commonwealth conceded the fact. Hairston's Brief at 64–67 (citing *Knight*, 156 A.3d at 245-47). According to Hairston, *Rizzuto* and *Knight* require that the jury "follow the mandatory language of the statute and state the factors accurately on the verdict slip." Hairston's Brief at 66. Hairston asserts that by allowing a death sentence based on the

non-statutory aggravating factor in this case, the trial court "introduced arbitrariness into the death penalty process." *Id.* at 67.

In response, the Commonwealth contends that the jury clearly found that it satisfied, through the stipulation, the aggravating circumstance in Section 9711(d)(9). The Commonwealth argues that the verdict slip was consistent with the trial court's instructions, and that when read "as a whole," it "clearly establishes that the jury found beyond a reasonable doubt that the Commonwealth had satisfied the aggravating circumstance set forth in [Section] 9711(d)(9)." Commonwealth's Brief at 36-37. The PCRA court similarly opined, "The fact that in identifying one of the aggravating factors found by the jury to have been proven beyond a reasonable doubt the jury did not track the precise language of the aggravating factor provided for in the statute does not affect the validity of the verdict." Notice of Intention to Dismiss, 10/30/2018, ¶ 1.

The Commonwealth distinguishes *May*, *Rizzuto* and *Knight.* The Commonwealth states that in *May*, the jury improperly made a finding of rape that was not supported by the evidence, whereas here, the jury properly made a finding that Hairston had four prior convictions, which was supported by the evidence. Therefore, it contends that *May* is not controlling. Commonwealth's Brief at 35. With regard to *Rizzuto* and *Knight*, the Commonwealth disputes whether Hairston correctly interprets those cases by placing greater emphasis on the verdict slip than was intended. *Id.* at 36.

Our review of the record indicates that the jury findings complied with the law. The jury received verdicts slips, which included the exact statutory language of the two aggravating circumstances. The trial court explained the meaning of aggravating and mitigating circumstances to the jury and informed it that two aggravating circumstances would be submitted for its consideration, including that "the defendant has a significant history of felony convictions involving the use or threat of violence to a person." N.T.,

4/18/2002, at 9–10. The trial court provided specific directions to the jury as to how to record its verdict and findings on the sentencing verdict slip, reading aloud the instructions and statutory language as printed on the verdict slips. *Id.* at 236–40. Having heard evidence and been instructed regarding the aggravating circumstances, the jury indicated that it arrived at one or more aggravating circumstances and decided upon a sentence of death. The jury's responses to the two aggravating circumstances are consistent with those aggravating circumstances as listed on the verdict, namely "The 4 felony convictions that have been placed in the record by stipulation" is directly responsive to 42 Pa.C.S. § 9711(d)(9), and "The murder of Sean Hairston" is directly responsive to 42 Pa.C.S. § 9711(d)(11).

We agree with the Commonwealth that the case law cited by Hairston does not support his position. Hairston correctly cites to *May* to illustrate that courts are prohibited from speculating about what the jury considered or intended in its verdict form, Hairston's Brief at 67-68 (citing *May*, 656 A.2d at 1345), but he is incorrect in suggesting that the appropriate reading of the form here requires speculation. The form included the exact statutory language of the aggravating circumstances of Sections 9711(d)(9) and (d)(11); the jury indicated that the sentence of death was based on its findings of "One or more aggravating circumstances which outweigh(s) any mitigating circumstance(s)[;]" and the jury listed the findings supporting its verdict. Verdict Slip at 2-3. Because this verdict form requires no speculation, it does not violate the principle established in *May.* Hairston's reliance on *Rizzuto* and *Knight* is also unavailing, as those cases deal with the mandatory language of Section 9711(e)(1) requiring the jury to find a mitigating factor. *Rizzuto*, 777 A.2d 1089; *Knight*, 156 A.3d at 245-47. Those cases addressed the requirement that the jury must acknowledge certain mitigating circumstances. They do not address aggravating circumstances, which we could never **require** a jury to find.

Moreover, those cases do not mandate that a jury reproduce, verbatim, the statutory language of any circumstances in order for a verdict to be valid.

Hairston cites no legal authority for the proposition that the jury's verdict slip must track the precise statutory language of an aggravating circumstance. Based on our determination that the verdict slip was not invalid, we conclude that there is no arguable merit to Hairston's assertion that trial counsel should have objected to it.

**B.      Appellate counsel's failure to challenge the verdict slip**

Hairston next complains that he was provided ineffective assistance of counsel when appellate counsel failed to argue that his death sentence was imposed based on the finding of a non-statutory aggravating circumstance. Hairston's Brief at 76-81 (citing 42 Pa.C.S. § 9711(h)(3) (providing that this Court shall affirm the sentence of death unless it determines that the sentence was the product of an "arbitrary factor")). This claim also relies on Hairston's unreasonable interpretation of the verdict slip. He maintains that the jury did not make the requisite finding of a "significant history of felonies" to establish the statutory aggravating circumstance of Section 9711(d)(9), but instead, found a non-statutory aggravating circumstance – specifically Hairston's sexual abuse of Chetia Hurtt. *Id.* at 78.

In making this claim, he draws attention to this Court's statement on direct review that the record "supports the jury's finding that [Hairston] had a significant history of violent felony convictions" and that the "record does not indicate that the jury's verdict resulted from an improper factor." *Commonwealth v. Hairston*, 985 A.2d 804, 809-10 (Pa. 2009). Hairston emphasizes that we did not address the alleged ambiguity with the verdict slip when reaching those conclusions. Hairston's Brief at 79. He complains that appellate counsel should have properly argued the issue and demonstrated that the verdict slip was

ambiguous and invalid on direct appeal. *Id.* at 79-80. Again, Hairston's challenge relies on the premise that the verdict slip was ambiguous. We have determined that the verdict slip, read as a whole and in context, unambiguously demonstrates that the jury found the existence of the aggravating circumstance of Section 9711(d)(9). Absent ambiguity in the verdict slip, there can be no merit to Hairston's argument that appellate counsel should have presented a challenge thereto. Having established that neither of Hairston's claims are of arguable merit, we find no error in the PCRA court's denial of relief.[12]

## C. Prosecutorial misconduct

On appeal, Hairston asserts that trial counsel provided ineffective assistance for allowing the trial court and prosecutor to misinform the jury that sexual abuse was an aggravating circumstance. Hairston's Brief at 69. He asserts that trial counsel should have objected to the prosecutor's arguments regarding the suffering caused by Hairston's sexual abuse. *Id.* at 72.

We reject Hairston's arguments that the prosecutor sought for the jury to reach and apply a non-statutory aggravating factor. It is well established that the Commonwealth may present evidence underlying a defendant's prior convictions to a sentencing jury so that the jurors may determine whether the convictions constitute the "significant history" aggravating circumstance and to permit the jury to assign proper weight to the aggravating circumstance. *Commonwealth v. Bomar*, 826 A.2d 831, 851 n.16 (Pa. 2003); *see also* 42 Pa.C.S. 9711(c)(1)–(2) (describing process for weighing

---

[12] As an alternative to waiver of this issue by trial and appellate counsel, Hairston raises the same argument in the context of an illegality of sentence challenge, arguing that his sentence is illegal because the verdict slip reflected that the jury based its sentence on a non-statutory aggravating circumstance. Hairston's Brief at 53-68. Even if this argument could serve as the basis for a claim of non-waivable sentencing illegality, his argument fails for the reasons stated.

aggravating and mitigating circumstances).  In repeatedly arguing about the significance of the abuse, the prosecutor was properly arguing for the jury to find that Hairston had a significant history of violent felony convictions and **to give that factor weight** when considering it alongside the mitigating circumstances found.[13]  N.T., 4/18/2002, at 17–18, 197–98.  Because Hairston has not demonstrated that the prosecutors' arguments in this regard were improper, we conclude that there is no arguable merit to Hairston's assertion that trial counsel should have objected to them.

Hairston also complains that trial counsel was ineffective for failing to object to the prosecutor's "improper argument" concerning Chetia Hurtt's "pain" because it unduly prejudiced Hairston at the penalty phase.  Hairston's Brief at 82.  In response, the Commonwealth argues that the prosecutor's comments were proper and, therefore, the claim lacks arguable merit.  Commonwealth's Brief at 43.  The PCRA court considered this claim meritless because the prosecutor made the statement "in the context of his argument to the jury that the aggravating circumstances outweighed the mitigating circumstances."  Notice of Intention to Dismiss, 10/30/2018, ¶ 4.  We consider the established legal standard for an ineffectiveness claim arising out of an allegation of prosecutorial misconduct:

---

[13]    In his concurrence, Justice Saylor indicates that he finds "problematic" the prosecution's presentation of Hurtt's testimony regarding Hairston's extensive history of perpetrating sex crimes against her over an eight-year period.  Concurring Op. at 6 (Saylor, J.).  As indicated, however, it was within the prosecution's province to do so to demonstrate to the jury the proper weight it should place on the Section 9711(d)(9) aggravator (namely, that the defendant "has a significant history of felony convictions involving the use or threat of violence to the person").  The concurrence acknowledges that Hairston does not identify any testimony that specifically referenced any wrongful activity by Hairston other than the felonious conduct encompassed by the Section 9711(d)(9) aggravator.  *Id.*  This fact further reinforces our determination that the jury's verdict of death was based upon its weighing of the aggravating and mitigating factors rather than upon any "non-statutory aggravator."

A claim of ineffective assistance grounded in counsel's failure to object to a prosecutor's comments "may succeed when the petitioner demonstrates that the prosecutor's comments violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process." *Commonwealth v. Cox*, 983 A.2d 666, 685 (Pa. 2009). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Cox, supra* at 685 (quoting *Greer v. Miller*, 483 U.S. 756, 765, (1987)). "The touchstone is the fairness of the trial, not the culpability of the prosecutor." *Id.*

A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. [*Cox*, 983 A.2d] at 687. Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. *Id.* Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made. *Id.* During closing argument in the penalty phase, a prosecutor must be afforded reasonable latitude, and permitted to employ oratorical flair when arguing in favor of the death penalty. *Commonwealth v. Stokes*, 839 A.2d 226, 231–32 (Pa. 2003).

Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial:

> Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Cox, supra* at 687 (citation omitted).

*Commonwealth v. Chmiel*, 30 A.3d 1111, 1181–82 (Pa. 2011) (some internal citations omitted). Pursuant to 42 Pa.C.S. § 9711(a)(2), "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible" at the sentencing hearing.

As indicated previously, the Commonwealth introduced evidence regarding Hairston's sexual assault convictions to establish the aggravating factor set forth at 42 Pa.C.S. § 9711(d)(9) ("the defendant has a significant history of felony convictions involving the use or threat of violence to the person"). The facts of the sexual assaults, including Hairston's threats to harm Chetia Hurtt's family if she revealed the assaults, were told to the sentencing jury. N.T., 4/18/2002, at 30–47. The Commonwealth elicited testimony that after years of silence because she did not want Hairston to carry out his threat to harm her family if she told anyone about the sexual abuse, Chetia Hurtt agreed to press charges. *Id.* at 36, 42–44, 46. About a year later, when Hairston confessed to killing his wife and son, he told police he did so because of the sexual assault charges. N.T., 4/17/2002, at 21. Chetia Hurtt bluntly testified as to the impact that the loss of her mother and brother had on her: "[I]t destroyed me." N.T., 4/18/2002, at 48. The prosecutor presented Chetia Hurtt's testimony as evidence related to the impact that the death of the victims had on the family; that impact was "the guilt that [Chetia Hurtt's] going to have to live with for the rest of her life because finally she had the courage to speak up and talk about the abuse that she had suffered for years." *Id.* at 44–45.

The Commonwealth's description of Chetia Hurtt's pain was based on evidence given at trial and was nothing more than a request to the jury to provide the appropriate weight to the aggravating and mitigating circumstances. *Id.* As the PCRA court astutely observed, "[t]he prosecutor made that statement in the context of his argument to the jury that the aggravating circumstances outweighed the mitigating circumstances." Notice of Intention to Dismiss, 10/30/2018, at 4. Moreover, the trial court instructed the jury that "impact" evidence could "only be used by you to weigh the aggravating factors against

the mitigating factors." N.T., 4/18/2002, at 232. Juries are presumed to follow instructions given by the court. *Commonwealth v. Hannibal*, 156 A.3d 197, 217 (Pa. 2016).

The case relied on by Hairston, *Commonwealth v. LaCava*, 666 A.2d 221 (Pa. 1995), does not support his position. *LaCava* involved a prosecutor who told the jury that the defendant, who had killed a police officer, was a drug dealer and that drug dealers are society's leeches. We vacated the death sentence and remanded for a new sentencing hearing because

> the prosecutor attempted to expand the jury's focus from the punishment of [the defendant] on the basis of one aggravating circumstance (i.e., that [the defendant] killed a police officer acting in the line of duty), to punishment of [the defendant] on the basis of society's victimization at the hands of drug dealers.

*Id.* at 237. In contrast, the prosecutor in the case at hand limited the jury's focus to punishment of Hairston on the basis of two aggravating circumstances, including the "significant history" aggravating circumstance; the prosecutor argued that, given the impact of the killings on Chetia Hurtt, the sentencing jury should deem the aggravating circumstances as outweighing the mitigating circumstances. Hairston cannot convincingly maintain here, where the prosecutor was permitted to ask the jury to consider the impact of Hairston's killings on Chetia Hurtt, that the prosecutor's reference to her pain resulted in an unfair prejudice "such that the jurors could not weigh the evidence and render a true verdict." *Cox*, 983 A.2d at 687. We conclude that this claim lacks arguable merit; therefore, the PCRA court did not err in denying Hairston's requested relief.

### D. Expert testimony regarding credibility

Through his next issue, Hairston complains that trial counsel was ineffective for failing to object to the penalty phase testimony of the Commonwealth's psychiatry expert, Bruce Wright, M.D., regarding the veracity of Hairston's statements about hearing voices. Hairston's Brief at 86. Specifically, Hairston complains that counsel should have objected to the following statement by Dr. Wright:

> Q.      Sir, were you able to come to a conclusion about [Hairston's] auditory hallucination in light of the fact that he told you one thing and told Dr. Wettstein[14] another and yet another version from the Mayview reports?
>
> A.      My conclusion is that I had great difficulty believing anything he said to me because of the inconsistent nature of the history he gave me, as well as what I reviewed in those other records that you mentioned.

N.T., 4/18/2002, at 168–69.

Rule 705 of the Pennsylvania Rules of Evidence provides that an expert witness is permitted and, in fact, must testify regarding the source materials utilized to develop her conclusions and opinions. *See* Pa.R.E. 705 ("If an expert states an opinion the expert must state the facts or data on which the opinion is based."). The Comment to the rule recognizes that facts and data underlying the expert opinion may often be inadmissible evidence. *See id.* cmt. (providing for a limiting instruction when the facts and data underlying the expert opinion are inadmissible). This Court has reiterated the notion that, "when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion,

---

[14] The defense called Robert Wettstein, M.D., as a forensic psychiatry expert. He opined that defendant suffered from auditory hallucinations with a psychotic feature.

that opinion is regarded as evidence in its own right and not as hearsay in disguise." *Commonwealth v. Daniels*, 390 A.2d 172, 176 (Pa. 1978) (citing *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971) (en banc)). In sum, regardless of whether a piece of evidence is generally inadmissible, an expert may reveal the facts and data upon which her opinion is based.

Because issues of credibility are within the exclusive province of the jury, *Commonwealth v. Crawford*, 718 A.2d 768, 772 (Pa. 1998), expert testimony on the issue of a witness's credibility is prohibited. *Commonwealth v. Maconeghy*, 171 A.3d 707, 777 (Pa. 2017) ("[N]o expert testimony is to be employed to validate the credibility of other witnesses[.]"); *Commonwealth v. Seese*, 517 A.2d 920, 921 (Pa. 1986) (disapproving of testimony by expert witness that "based upon her own experience, young children usually do not fabricate stories of sexual abuse[.]").

In addressing Dr. Wright's testimony, the PCRA court acknowledged the general principle that an expert may testify regarding the facts and data that the expert considered in forming his opinion. The PCRA court observed that this statement about Hairston's veracity was made in the context of explaining to the jury his expert conclusion that Hairston's mental condition on the day of the murders was the result of an antisocial personality disorder, not the psychosis and depression the defense forensic psychiatry expert, Dr. Wettstein, diagnosed. Notice of Intention to Dismiss, 10/30/2018, ¶ 6.

We agree with the PCRA court that the expert testimony in this instance was permissible. The law provides that an expert is permitted to testify regarding the reasons for reaching its conclusions. Pa.R.E. 705. Hairston does not dispute that he gave inconsistent accounts of his hallucination; nor does he argue that the inconsistencies

were not a proper diagnostic criteria; nor does he complain of counsel's failure to avail himself of a limiting instruction. He does not acknowledge or confront the well-settled rule that an expert must testify to the basis for reaching her opinion. Instead, he merely cites to cases where the expert was "employed to validate the credibility of other witnesses." *Maconeghy*, 171 A.3d at 777; *see also Seese,* 517 A.2d at 922. However, unlike in those cases where the sole purpose of the expert testimony was to bolster a witness's credibility, the purpose of Dr. Wright's testimony was to explain his reasons for reaching his conclusions. The Pennsylvania Rules of Evidence permit an expert to testify regarding his reasons for reaching his conclusions. We find no error in the PCRA court's denial of this challenge.

### E. Expert testimony regarding Hairston's juvenile record

Finally, Hairston claims counsel was ineffective in failing to object to Dr. Wright's testimony about facts that were not in evidence, specifically, Hairston's arrest as a juvenile. Hairston's Brief at 92. Hairston complains that the Commonwealth's expert, Dr. Wright, testified that one of the criteria he considered in determining that Hairston suffered from antisocial personality disorder was that "he was arrested at 17 years of age for a hit and run accident." *Id.* at 92–93 (citing N.T., 4/18/2002, at 171). He asserts that this was evidence of a crime which is prohibited under Rule 404(b)(1) of the Pennsylvania Rules of Evidence and that none of the exceptions to that rule applied. *See* Pa.R.E. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). He argues that the testimony improperly introduced facts that were not in

evidence and that it improperly prejudiced his defense. Therefore, he asserts, counsel should have objected.

As with the previous claim, the PCRA court rejected this basis for relief on the grounds that it was permissible for Dr. Wright to consider this fact "in reaching his conclusions as [to] the mental state of" Hairston.[15] Notice of Intention to Dismiss, 10/30/2018, ¶ 7. The PCRA court pointed out that both sides presented expert witnesses who considered Hairston's records and the jury was informed of Hairston's multiple convictions for crimes of violence and as such, Hairston could not have been prejudiced by the "vague reference to a juvenile arrest[.]" *Id.*

With regard to Hairston's assertion that his juvenile arrest for hit and run was not in the record, pursuant to Pennsylvania Rule of Evidence 703 "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed … [i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject… ." Pa.R.E. 703. The Commonwealth correctly observes that it is customary for expert witnesses to review extensive sources when formulating an opinion about a defendant's psychological condition.

_____

[15] Hairston briefly argues that the testimony regarding his hit-and-run offense violate Rule of Evidence 404(b)(1)'s prohibition of the introduction of "[e]vidence of a crime, wrong, or other act … to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). We reject this argument on two grounds. First, the evidence in question was not introduced in an attempt to prove a propensity to have committed the crimes with which he was charged in this case. In fact, the evidence here was introduced in the penalty phase of the trial, after the jury had already found him guilty of, inter alia, first-degree murder. Second, Hairston has not directed this Court to any authority that might suggest that the purpose for which the evidence was introduced, namely in support of the expert's diagnosis of antisocial behavior disorder, does not constitute an exception to Rule 404(b)(2)'s list of non-exhaustive exceptions thereto.

Commonwealth's Brief at 55–56 (citing *Commonwealth v. Baumhammers*, 92 A.3d 708, 715 (Pa. 2014) (describing expert as having reviewed records including 230 sources in drafting lengthy expert report)).  In addition, an expert may rely upon evidence introduced in a report by another expert.  C*ommonwealth v. Vandivner*, 962 A.2d 1170, 1178-1180 (Pa. 2009) (acknowledging the "a medical witness may express opinion testimony on medical matters based, in part, upon reports of others… ."

Dr. Wright testified that he discovered the existence of Hairston's hit-and-run conviction from his review of the report of Hairston's expert witness, Dr. Wettstein, based upon his (Dr. Wettstein's) review of the records of Western Psychiatric Hospital.  N.T., 4/18/2002, at 178-79 ("Dr. Wettstein said on [p]age 9 [of his report] he was arrested once. At age 17, for driving his own vehicle without a license and for reckless driving and hit and run.").  In our view, this testimony was sufficient to establish the existence of Hairston's prior hit-and-run conviction to support Dr. Wright's testimony that he properly relied upon this prior conviction in arriving at his diagnosis.  We note that Hairston does not contend that he was not convicted of hit-and-run as a juvenile or that Dr. Wettstein did not acknowledge the conviction in his expert report.  Moreover, as with his claim regarding Dr. Wright's testimony regarding credibility, Hairston does not challenge the well-established rule that the facts and data underlying an expert opinion are admissible to explain how the expert reached his or her conclusion.  Likewise, Hairston does not claim that trial counsel provided ineffective assistance by failing to request a limiting instruction pursuant to Rule 705.  *See* Pa.R.E. 705, cmt. ("When an expert testifies about the underlying facts and data that support the expert's opinion and the evidence would be otherwise inadmissible, the trial judge upon request must, or on the judge's own

initiative may, instruct the jury to consider the facts and data only to explain the basis for the expert's opinion, and not as substantive evidence.").

Finally, we note that Hairston fails to establish any prejudice resulting from Dr. Wright's testimony. Given the egregious nature of the crimes at issue in the guilt phase, he cannot show that the jurors would have reached a different verdict if they had not heard this vague reference to Hairston's involvement in a hit-and-run accident as a teenager. Commonwealth's Brief at 57. In the present case, the jury had already convicted Hairston of far more serious crimes than a juvenile offense for hit-and-run.

Hairston's assertion that penalty phase counsel should have objected to Dr. Wright's testimony is thus without merit.

**CONCLUSION**

Based upon the foregoing, we affirm the PCRA court's order denying relief.

Chief Justice Baer and Justices Todd, Dougherty, Wecht and Mundy join the opinion.

Justice Saylor files a concurring opinion.